Louise Cook SCHOELMAN, Appellant,

v.

The STATE of Texas, Appellee.

No. 61788.

Court of Criminal Appeals of Texas.

Jan. 18, 1983.

Rehearing Denied Feb. 16, 1983.

L.J. Krueger, Liberty, for appellant.

James S. McGrath, Dist. Atty., John B. Stevens, Jr., Asst. Dist. Atty., Beaumont, Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

Before ODOM, TOM G. DAVIS and CLINTON, JJ.

## OPINION

CLINTON, Judge.

Convicted of murder on a verdict of guilty returned by a jury which also assessed punishment at confinement for fifteen years, appellant presents seven grounds of errors to achieve reversal of the judgment. Since five of the seven complain about failure of the trial court over objection to charge on one or another issue said to have been raised, a statement of the facts of the matter is required.

The setting of the homicide in question is a Sunday evening in November at Sue's Place in Beaumont. The proprietor, Evie Sue Tillery, is the deceased, and the indictment charges that appellant did then and there knowingly and intentionally cause her death by shooting her with a gun. But the scenario played out by three principal actors is more tangled than that simple allegation.

Appellant, nicknamed and commonly referred to throughout trial as "Dusty," was then a fifty four year old widow who resided in Houston. Buford Coe and appellant had known each other for more than twenty years, he being the "best friend" of a former husband. (The prosecution sought to create an impression with the jury that Coe and appellant were more than just friends of long standing, and that turned

out to be true.)[1] Sue Tillery was a mutual friend of appellant and Coe.

According to appellant she was in Beaumont at the instance of Coe; he had called her at home Saturday night and asked she meet him Sunday at Sue's Place—and bring a thousand dollars along for him. Appellant replied that she could not cash a check for that amount, but would bring what she could. On the way to Beaumont appellant had car trouble; she stopped at a station in Raywood, and while she had the radiator filled and bought a new cap for it, she called to Beaumont and reported the difficulty she was having. Coe and two other friends departed for Raywood to assist, but when they arrived the station attendant told them what he had done to send appellant on her way to Beaumont. Thus appellant got to Sue's Place late Sunday afternoon ahead of Coe and his companions.

Donna Jean Babb had been working at Sue's Place for just over four weeks. When appellant came in Tillery was at her table near the cash register. Appellant went to her and Tillery introduced her to Babb as "Dusty"—"a very old friend." About an hour later Coe, Douglas Taylor and L.T. Hall and perhaps another man arrived and joined appellant and Tillery. Babb served the beer from time to time. There was friendly conversation; they played the "juke box;" others came and went. Then, after some two hours, came trouble.

As Babb related it, appellant showed a ring on her finger to Coe, remarking that it would have been his birthday present if he had been around to get it. She said she had bought it for $1600 at an auction. Coe removed the ring from her finger and put it on one of his own. Soon they started "arguing" about things, and appellant demand-ed Coe return the ring. He professed an inability to get it off his finger. Tillery produced a bottle of alcohol, but Coe said, "That won't do. I need soap." He went into the restroom. When he returned he claimed not to have the ring; he said, "I misplaced it somewhere." Tillery went to the restroom but did not find the ring. Appellant became "real mad" at this point.

Babb recalled that Coe went outside the place two or three times and on each occasion appellant followed, again insisting that he return her ring. At some point appellant came back inside, yelled to Tillery that she was going to call the police and went to the phone. She was dialing when Tillery ran up and grabbed the phone out of her hand. Babb came along and "slammed it back on the receiver."[2] Tillery told both appellant and Coe to leave—for them to take their "personal problem down the road." They went to the parking lot. By now nearly every unidentified patron had left.

Instructed by Tillery to do so, Babb went to the front door and looked through a small upper window to watch appellant and Coe, ostensibly to see if they were departing. Instead, she saw appellant put her purse on the trunk of her car, open it and pull out a snubnosed pistol that Babb believed to be a .38 caliber; appellant pointed the pistol at Coe.[3] Babb called to Tillery, "Sue, she pulled a gun on him." Whereupon, according to Babb, telling her to call the police, "Sue went outside and told Buford to come back in and tried to calm 'Dusty' down."[4] When Tillery told Coe to "go in there and sit down," Babb heard appellant declare: "I'll go around any of you mother fuckers to get to his Goddamned ass."[5]

---

1. When she testified appellant admitted that during episodic "legal separations" from his wife, Coe and she "dated."

2. Babb agreed that both she and Tillery were "more concerned about ... the police being called because of that license [on the wall] than ... about a diamond ring being missing."

3. Appellant testified the incident did not occur.

4. On crossexamination Babb reaffirmed that there was no argument between appellant and Tillery "when Sue was trying to get her calmed down *and they couldn't*." (All emphasis is added throughout by the writer of this opinion unless otherwise indicated.)

5. Appellant vehemently denied making such a statement at any time, insisting that she did not use such language. Babb conceded that she had not included the declaration in either of

She did not see appellant with a gun while Tillery was talking to appellant.

Coe backed inside and soon Tillery, having failed to calm appellant down, returned. Appellant got in her car and started to drive away but stopped and walked to the front door. Tillery "slammed the door in her face" and locked it; Babb went to the back and locked that door. Then Babb called the police. Appellant tried to get in; she went from one door to another and finally kicked on the front door, near its handle.[6]

Tillery stated that she was going to open the front door and tell appellant to leave because the police were on the way. Coe left the table and walked with Tillery. Tillery opened the door with her right hand, pulling it to the inside and to her right. Coe was just behind and "maybe a little bit to the right" of her also holding the door with his right hand. Babb estimated appellant was standing about two feet away, with the pistol. From her location back away from the door near a pool table Babb did not hear anyone say anything.[7] Appellant just pulled the trigger; the shot hit Tillery near the middle of her chest, and she kind of turned and crumpled down right inside the door area. Appellant returned to her car, "jumped" in it and "took off."

The State's other witness on its case in chief was a pathologist, who determined the cause of death, *viz:*

> "Gunshot wound to left anterior chest. The entrance wound being in the third thoracic space in the left of the chest, through the heart vessel, and the bullet was located in the right posterior back."

He opined that it was a shot at close range, but was not asked to estimate the distance.

On rebuttal the State called only Douglas Taylor, one of the Coe group. He had worked for Coe and considered him a good, close, personal friend. It was through Coe that Taylor had come to know appellant some two or three years earlier. Explaining that most of the time he was engaged in conversation with one Fred Ellard and helping Hall, who was confined to a wheelchair, go outside from time to time, Taylor did not—or would not—admit to seeing or hearing very much of what Babb had recounted.[8] Just after he had come back in the last time, appellant was locked out and through the glass in the front door Taylor saw that she "appeared to be ... mad." He did observe Tillery going to the front door and Coe accompanying her; he watched Tillery open the door, heard the gunshot and saw her fall backwards and Coe catch her in his arms. Taylor conceded that at the moment the shot was fired he could not actually see Tillery since his view of her was blocked by the bigger Coe, nor could he see appellant. Indeed, he "couldn't even testify that [appellant] is the one that fired the shot." At that instant, moreover, he placed Babb behind the bar—not at the pool table.

Appellant testified that soon after Coe and the others arrived she asked him why he needed the money he had asked for, but Coe replied, "I can't tell you here." He said he would tell her later, and appellant then wanted to leave, but Coe said "Later." Then she related how he noticed the ring, "grabbed" her hand and, remarking that he had always wanted a ring like that, "snatched" it from her finger. She asked for it back; he refused, saying "I'm going to wear it a while." The request and refusal were repeated several times. At one point appellant left the table and went to

---

two statements to police nor in her examining trial testimony.

**6.** From photographs in evidence it appears that she kicked on the door at least twice.

**7.** "Q: Well, if there was anything said, were you close enough to have heard it?
A: If they had talked loud enough, yes, sir."

**8.** He knew appellant tried to make a phone call because she took two dimes of his change for a round of beer, but he did not hear any conversation or see Tillery take the phone out of her hand. If Coe ever went out the front door that evening it was while Taylor was out back helping Hall; Taylor never heard any exchange between Tillery and appellant nor any heated discussion with Coe about her ring.

the restroom. When she returned Coe was not in the place; she went looking for him and found him outside talking with a man in a truck about cattle for his ranch in Waller. After they returned and sat at the table, she noticed Coe was no longer wearing her ring. She then got "upset" and demanded to know what he had done with the ring. (At some undefined point, appellant testified, Hall said he would get the ring back for her.) She related the attempt to call the police that Tillery and Babb thwarted. With that she determined to return to Houston, first denying that Tillery had asked her to leave but later conceding that she had.

As she was driving out, however, she saw Coe and Tillery standing in the doorway. "I wasn't exactly mad.[9] I just was afraid that he would lose the ring. So, I thought, 'Well, I will ask him one more time for the ring.'"

A .38 special was on the front seat. Appellant knew it was "fully loaded."

"I got out of the car and I took the gun and I thought, 'I will just scare him into giving me my ring back.'"

Coe, said appellant, is "deathly afraid of guns." She went to them.[10]

"I looked him straight in the eye, and I said 'I'm going to give you one more chance to give my ring back,' and at that time, I felt something hit the gun, and it went off and she fell."[11]

After the gun discharged appellant was "horrified ... shocked ... scared." She got in her car and drove away, but stopped some distance away to "get control of myself" for she was crying and shaking, and "afraid to drive in that condition." Then she went back to Houston. Once there she returned a long-distance telephone call to Coe who told her that Tillery was dead.

On crossexamination appellant went through the entire transaction again, and she added some details about which Babb had testified: "they" shut the front door "in my face," so she went to the back; she did kick the front door but only once that she recalled. Her defensive attitude at the critical moment is reflected by the following exchange:

"Q: You really took this gun and went to that door to frighten Coe, is that correct?

A: That is correct.

Q: And by frightening him, retrieve your ring, is that correct?

A: I thought he would just give it to me. I had no intention of hurting anyone.

Q: Your intent was to point the gun at him and say, 'I want my ring,' is that correct?

A: Yes.

Q: And you did that, did you not?

A: Yes.

\* \* \* \* \* \*

Q: I know you didn't have to have any intent to fire it, you had the gun in your hand and you say it accidentally went of, then you didn't pull the trigger, Mrs. Tillery hit the gun, isn't that what you said?

A: She grabbed.[12]

Q: And that caused the gun to go off?

A: That's correct.

Q: All right. But if you had intended to shoot Buford or anyone, all you had to do was pull the trigger?

---

**9.** Appellant had just reaffirmed that "prior to this time" she was "upset."

**10.** Her testimony included drawing a diagram locating the positions of Coe, Tillery and herself at or near the doorway. The diagram is not in the record, so we are unable to follow testimony such as "I am right here" and Coe's hand is "right here" et cetera.

**11.** Appellant would later charge that though she did not actually see Tillery "grab" her hand, "She had to. It was an accident. As God is my witness, it was an accident." She was "definitely positive" that Tillery "touched" her, but as to being positive Tillery "grabbed" her, "All I know is the gun went off."

**12.** At that precise moment appellant was "surprised" since she "wasn't expecting that," and then was "shocked."

A: Sir, I presumed that to be true. I never pulled the trigger on that gun, intentionally, in my life." [13]

However, later on, appellant insisted that she was not pointing the gun at anyone, it was "kind of in the air," she was not looking at the gun but in the eyes of Coe and, finally the concession: "I do not know how it happened, sir. All I know is I was looking him straight in the eye. I did not see, I only felt."

Buford Coe was not called to testify.

The trial court routinely charged the jury on the law of murder, authorizing a conviction if jurors believed from the evidence beyond a reasonable doubt that appellant knowingly or intentionally caused the death of Sue Tillery by shooting her with a gun. As well the court instructed the jury on the law of causation prescribed by V.T.C.A. Penal Code, § 6.04(b)(2) [14] and of prior relationships pursuant to id., § 19.06.[15] The charge also pointed out that appellant "has urged the defense of accident" and instructed the jury conformably with what was then generally believed to be proper in the circumstances.[16]

**13.** Appellant knew the gun did not have to be cocked and would fire when its trigger was pulled.

**14.** The instruction reads: "A person is criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated or risked is that a different person was injured, harmed or otherwise affected."

**15.** "You are entitled to consider all the relevant facts and circumstances surrounding this offense and the previous relationship existing between the accused and the victim, together with all facts and circumstances going to show the condition of the mind of the accused at the time of the offense."

**16.** "Our law provides that no act done by accident is an offense. Therefore, if you believe that the defendant committed the act alleged, but you further believe that such act was caused by accident, or if you have a reasonable doubt thereof, you shall find the defendant not guilty."

Now, however, as the Court En Banc has pointed out:

"There is no law and defense of accident in the present penal code... The function of the former defense of accident is performed

■■■ By proper procedure appellant objected to the charge because the trial court did not include instructions on voluntary manslaughter, involuntary manslaughter, criminally negligent homicide, aggravated assault and assault, and complains respectively of denial of her objections in separate grounds of error. We are of the opinion that certain grounds are meritorious for reasons about to be stated.

Decisions of the Court make clear the following propositions of law generally applicable in determining whether a charge should include instructions on such matters. Collected in, e.g., *Moore v. State*, 574 S.W.2d 122, 124 (Tex.Cr.App.1978), they are:

"The credibility of evidence and whether it is controverted or conflicts with other evidence in the case may not be considered in determining whether a defensive charge or an instruction on a lesser included offense should be given. When evidence *from any source* raises a defensive issue or raises an issue that a lesser included offense may have been committed ...[17] the issue must be sub-

now by the requirement of V.T.C.A. Penal Code, Section 6.01(a), that 'A person commits an offense only if he voluntarily engages in conduct...' *Dockery v. State*, 542 S.W.2d 644, 649–650 (Tex.Cr.App.1976). If the issue is raised by the evidence, a jury may be charged that a defendant should be acquitted if there is a reasonable doubt as to whether he voluntarily engaged in the conduct of which he is accused."
*Williams v. State*, 630 S.W.2d 640, 644 (Tex.Cr. App.1982). See also *Garcia v. State*, 605 S.W.2d 565, 566 (Tex.Cr.App.1980), but with the caveat that the requested charge shown at 567 is not commended—cf. *Simpkins v. State*, 590 S.W.2d 129, 135 (Tex.Cr.App.1979), and see McClung, Jury Charges for Texas Criminal Practice (Revised Edition January 1981) 242.

In the case at bar appellant objected to "the definition of the court in describing accident" in that "the charge fails to apply the law to the facts of this case." However, overruling of that objection is not brought forward as a ground of error.

**17.** We have omitted language about requesting a charge since error may be just as well preserved by a proper objection to failure to submit the issue. See *Roberts v. State*, 590 S.W.2d 498, 501, 502 (Tex.Cr.App.1979) and *Boles v. State*, 598 S.W.2d 274, 278 (Tex.Cr.App.1980).

mitted to the jury. It is then the jury's duty, under the proper instructions, to determine whether the evidence is credible and supports the defense or the lesser included offense. [citations omitted]"

■ Voluntary manslaughter, denounced and defined by V.T.C.A. Penal Code, § 19.04(a), (b) and (c), is "the same as murder 'except that he caused the death under the immediate influence of sudden passion arising from an adequate cause,'" *Braudrick v. State,* 572 S.W.2d 709, 710 (Tex.Cr.App.1978).[18] The exception "is not an element of voluntary manslaughter, but is instead in the nature of a defense to murder that reduces that offense to voluntary manslaughter," *ibid.* and *Humphries v. State,* 615 S.W.2d 737, 738 (Tex.Cr.App. 1981). The Court takes guidance from cases decided under the former manslaughter statutes, *McCartney v. State,* 542 S.W.2d 156, 160 (Tex.Cr.App.1976), and the governing principle is: "The charge on voluntary manslaughter is mandatory only when there is evidence that the defendant acted under the immediate influence of sudden passion arising from adequate cause." *Cerda v. State,* 557 S.W.2d 954, 958 (Tex.Cr. App.1977); *McCartney v. State,* supra, at 160.[19] We find there was some evidence that raised the issue that appellant was acting under such "immediate influence."

■ Coe and appellant had been engaging in a heated exchange over his taking and refusing to return her ring. Every witness who saw and heard her characterized her emotional mien as "real mad," "mad" or "upset." Tillery tried but was unable to calm her down. Indeed, appellant herself agreed she was upset. Though she started to leave the place, appellant testified she decided to frighten Coe into returning the ring. Confronted with closed and locked doors and, as Taylor observed her through the glass panel, "mad," she kicked once, perhaps twice, near the handle of the front door. When the door was opened, according to both witnesses for the prosecution who heard no words spoken, appellant fired her .38 special revolver.

Considering all relevant facts and circumstances we hold that the evidence was sufficient to warrant an instruction on voluntary manslaughter. *Humphries v. State,* supra, (stabbing in course of heated argument); *Braudrick v. State,* supra, (stabbing in escalating bar room brawl); *Lucky v. State,* 495 S.W.2d 919 (Tex.Cr.App.1973) (shooting shortly after insulting conduct led to heated argument); *Parks v. State,* 473 S.W.2d 32 (Tex.Cr.App.1971) (stabbing during argument over a dollar debt); and see and compare *McGee v. State,* 473 S.W.2d 11 (Tex.Cr.App.1971).

■ We are also of the opinion that the trial court should have submitted to the jury instructions with respect to involun-

---

18. The statute provides in pertinent part:

"(a) A person commits an offense if he causes the death of an individual under circumstances that would constitute murder under Section 19.02 of this code, except that he caused the death under the immediate influence of sudden passion arising from an adequate cause.

(b) 'Sudden passion' means passion directly caused by and arising out of provocation by the individual killed *or another acting with the person killed* which passion arises at the time of the offense and is not solely the result of former provocation.

(c) 'Adequate cause' means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection."

In *McGee v. State,* 473 S.W.2d 11 (Tex.Cr. App.1971) Judge Odom drew from Webster's Dictionary the following definitions of terms arguably germane here, *viz:*

"Anger is the general term for emotional reaction of extreme displeasure and suggests neither a definite degree of intensity, nor an outward manifestation; rage implies loss of self-control from violence of emotion; resentment is a feeling of indignant displeasure at something regarded as a wrong, insult, or injury..."

*Id.,* at 15, n. 1 (Odom, J., dissenting). For further nuances see "Anger," Standard Handbook of Synonyms, Antonyms and Prepositions, Funk & Wagnalls, New York (1947) at 49.

19. "[I]t was well established under former Article 1257c that it was not error to fail to instruct on the issue of murder without malice unless there was *some* testimony raising the issue. [Citations omitted]"

tary manslaughter and criminally negligent homicide. As has been shown there was testimony that, knowing it was loaded, appellant pointed the pistol at Coe and that she pointed it at Tillery just before it fired. The Court has held that "pointing a loaded gun at a person constitutes criminal negligence," and that the distinction between involuntary manslaughter proscribed by V.T.C.A. Penal Code, § 19.05(a)(1)—recklessly causing the death of an individual—and criminally negligent homicide under *id.,* § 19.07(a)—causing the death of an individual by criminal negligence—"lies in their respective culpable mental states of recklessness and criminal negligence," *Giles v. State,* 617 S.W.2d 690, 691 (Tex.Cr.App. 1981). That distinction was explained in *Lewis v. State,* 529 S.W.2d 550, 553 (Tex.Cr. App.1975), and reiterated in *Moore v. State,* supra, at 123.

As in *Branham v. State,* 583 S.W.2d 782 (Tex.Cr.App.1979), appellant's testimony indicated that while she intended to point the gun at another person "she was not aware of the risk which her conduct created," and that "the gun accidentally discharged when she was grabbed;" on the other hand there was testimony indicating "that she perceived the risk of her conduct," *id.,* at 785. "Which of the two inferences regarding the accused's awareness of the risk is correct is a matter to be drawn from the circumstances by the jury," *Giles v. State,* supra, at 691. See *London v. State,* 547 S.W.2d 27 (Tex.Cr. App.1977): "A charge on accident was not sufficient to protect appellant's rights because it left the jury with the single alternative of finding him guilty of murder or setting him free," *id.,* at 29; see also *Campbell v. State,* 614 S.W.2d 443 (Tex.Cr.App. 1981) and cases cited and discussed therein, and *Moore v. State,* supra, at 124.

Accordingly, grounds of error two, three and four must be sustained, and we need not address the remaining grounds.[20]

The judgment of conviction is reversed and the cause remanded to the trial court.

**20.** On the matter of submitting aggravated assault and assault, however, see *Curtis v. State,*

573 S.W.2d 219, 233–234 (Tex.Cr.App.1978).