Jackie GOFF, Appellant,

v.

The STATE of Texas, Appellee.

No. 656–83.

Court of Criminal Appeals of Texas, En Banc.

Nov. 19, 1986.

William W. Vance, court appointed on appeal, Bryan, for appellant.

Travis B. Bryan, III, Dist. Atty. and Cathleen R. Riedel, Asst. Dist. Atty., Bryan, Robert Huttash, State's Atty., Austin, for the State.

---

OPINION ON APPELLANT'S PETITION
FOR DISCRETIONARY REVIEW

PER CURIAM.

Appellant petitions the Court to review the judgment of the Houston (14th) Court of Appeals affirming his conviction for murder. *Goff v. State*, 681 S.W.2d 619 (Tex.App.—Houston [14th] 1985). Having found that appellant had previously been convicted of a felony offense, the jury assessed punishment of ninety years confinement in the Texas Department of Corrections.

In a supplemental brief to the court of appeals appellant argued that the jury charge was fundamentally defective under this Court's holding in *Cobarrubio v. State*, 675 S.W.2d 749 (Tex.Cr.App.1984) and *Jenkins v. State* (Tex.Cr.App., Nos. 64,000–64,004, delivered February 16, 1983) (Motion for leave to file motion for rehearing in No. 64,004 pending). The court of appeals held that "the evidence did not raise the issue of voluntary manslaughter, and any error in the giving of such an instruction was to appellant's benefit and, therefore, harmless." 681 S.W.2d at 625. Appellant contends that the court of appeals erred in disposing of his contention in this manner, and this Court granted his petition for discretionary review to address this argument.

The jury charge in this case suffers from the same infirmity as did the charge that was found defective in *Cobarrubio*, supra, and *Jenkins*, supra, *viz:* it fails to place upon the State the burden of negating sudden passion in the paragraph of the charge applying the law of murder to the facts of the case. Thus there exists the "decided likelihood" the jury may have disposed of appellant's case without ever having considered the sudden passion issue, which, if raised by the evidence, is required to be refuted by the State beyond a reasonable doubt. *Bradley v. State*, 688 S.W.2d 847 (Tex.Cr.App.1985).

The opinion of the court of appeals recognized that the *Jenkins* decision was pending on motion for rehearing before this Court, and that no definitive statement had as yet issued from this Court on the question of whether a *Cobarrubio* deficiency would amount to fundamental error. However, the court of appeals did not feel compelled to await this Court's pronouncement in *Jenkins*, but proceeded under the somewhat paradoxical premise that any "fundamental" error in this case was harmless because the evidence failed to support the charge given on voluntary manslaughter.

Appellant counters that where this Court has found a fundamental defect in the court's charge, no determination of harm will be made as a prerequisite to reversal, and cites *Gooden v. State*, 576 S.W.2d 382 (Tex.Cr.App.1979).

In light of our recent decision in *Almanza v. State*, 686 S.W.2d 157 (Tex.Cr.App. 1985), of which the court of appeals seems to have had some prescience, we find appellant's contention to lack merit. Because it is undisputed that no objection to the charge was made at trial, before required to reverse appellant's conviction we must find that, on the facts of the instant case, failure to give the jury instruction authorizing a conviction for murder in accordance with *Cobarrubio*, supra, was "so egregious and create[d] such harm that it deprive[d] accused of a fair and impartial trial." *Almanza*, 686 S.W.2d at 172, Article 38.19, V.A.C.C.P.

Upon review of the record in this cause we find that, even assuming that the issue of "sudden passion arising from an adequate cause" was raised by the evidence, as in *Lawrence v. State*, 700 S.W.2d 208, 213 (Tex.Cr.App.1985), "voluntary manslaughter is an incidental theory of the defense, [and thus] the subtle deletion of the State's burden of proof on the absence of sudden passion in the murder application paragraph cannot realistically be construed to inure to the [appellant's] egregious harm."

The indictment alleged, in relevant part, that appellant "unlawfully intentionally, intending to cause serious bodily injury to an individual, THOMAS KNOEDL, com-

mit[ted] an act clearly dangerous to human life, to wit: cut and stab him with a knife thereby causing the death of said THOMAS KNOEDL[.]" On the morning of March 6, 1981, the deceased's body with sixteen stab wounds in it was discovered in a ditch across the highway from a club called the Blue Dolphin in Brazos County, south of College Station.

Testimony of the State's witnesses showed that about 11:00 p.m. on the night of March 5, appellant entered the Blue Dolphin with two or three other men, ordered drinks at the bar, and proceeded to a table. Later they were joined by Lisa Vause, a dancer at the club. Several times over the course of the night, Knoedl approached their table, apparently to talk to Vause. Finally a "disagreement" erupted between Knoedl and appellant, and there was a general "rush" to the door. After some apparent commotion on the "portico" just outside the door, the three or four men were seen pursuing Knoedl across an adjacent field. A short time later the men returned and had a few drinks before the club closed.

The State introduced an edited statement taken from appellant after his arrest.[1] In this statement appellant admitted to "cut[ting]" Knoedl at least once in the "chest or stomach," apparently while on the portico, then chasing him, and eventually helping to discard the body in a ditch across the road. A pathologist testified that of the sixteen wounds found on the body, two stab wounds to the chest had punctured the lungs, and thus proved to be the direct cause of death. Several of the wounds were of a "defensive" nature, and all were consistent with a buck knife appellant was known to carry. Other witnesses relayed statements that had been made by appellant the morning after the killing that he had had to "cut" somebody. Evidence was presented of appellant's interstate flight, and of a plot to escape from the Brazos County jail after he was eventually captured.

Defensive evidence consisted entirely of appellant's testimony, which may of course suffice to raise both the defense of self defense and the issue of "sudden passion." *Medlock v. State*, 591 S.W.2d 485 (Tex.Cr. App.1980). Appellant testified he spent the afternoon and evening of March 5, 1981 drinking[2] and playing pool with his brother, Kenny Goff, at Murphy's Bar in College Station. Appellant and his brother were joined at some point by the deceased, Knoedl, whom appellant had not known previously. Knoedl had also been drinking heavily.[3] When Knoedl continued to lose at pool, he began to get belligerent. Upon being warned by appellant, Knoedl quit bothering him but persisted in harassing appellant's brother until about 4:00 o'clock in the afternoon, when the bar began to fill up with customers. Later, appellant and his brother were joined by Eric Ryan, whom appellant knew by sight from his job.

Between 10:30 and 11:00 o'clock on the same night, appellant, his brother and Ryan left Murphy's Bar and proceeded to the Blue Dolphin. Their reason for going was to pick up Vause, the girlfriend of Mike Murray, who shared a house trailer with Vause, appellant and appellant's brother.

At the Blue Dolphin appellant approached the bar to order drinks and inquire about Vause, who was backstage dressing. Knoedl was also in the Blue Dolphin. When Vause emerged from backstage and appellant began to talk with her, Knoedl attempted to interrupt in order to speak with Vause. It appeared to appellant that Vause "didn't want to have anything to do with" Knoedl, so appellant told

---

1. It seems the State did not want to be bound by other, exculpatory aspects of the statement. See, e.g., *Palafox v. State*, 608 S.W.2d 177 (Tex. Cr.App.1980). Appellant later "completed the picture," V.A.C.C.P., Art. 38.24, and the balance of the statement substantially coincides with his testimony at trial, see *post*.

2. Appellant also assertedly consumed five quaaludes during the course of the day.

3. The autopsy conducted on Knoedl revealed a blood/alcohol concentration of .36.

him to leave her alone. At this time Knoedl desisted, but was subsequently observed to be shouting at Vause as she danced. Vause joined appellant and his party at their table. Three or four times during the course of the night Knoedl approached the table in an attempt to speak with Vause, who sat on appellant's lap. Some pushing and name calling ensued between appellant and Knoedl. Knoedl made a statement indicating he intended to "kill" appellant, and at one point jabbed appellant in the ribs with an unspecified blunt object. Finally, Knoedl suggested that they go outside to fight.

At this point in appellant's direct testimony the following colloquy took place:

"Q: Okay. What did you do at that point?

A: I stood up.

Q: Where did you go?

A: Out the door.

Q: What were you thinking then?

A: I was thinking I would have to get him before he got me.

Q: All right. Now, what were you— How were you thinking? When you say: I was going to get him before he got me, how were you going to get him?

A: I figured when I walked out the front door I would hit him, I would hit him with the door. Because we was pretty close together.

Q: What did you think that was going to do, hitting him with the door?

A: I figured it would knock him off balance, then I could hit him.

Q: What actually happened?

A: When we walked out the door he was so close behind me when I turned around, he grabbed ahold of my T-shirt.

Q: What did you have on that night?

A: Pair of Levis and T-shirt.

Q: As you walked out the door and Tom Knoedl grabbed your T-shirt, what did you do then?

A: I tried to—I swung at him.

Q: Okay. And did he swing back at you, or what happened next?

A: Well, he still had ahold of my shirt, and we kind of went off balance.

Q: Did you fall down?

A: Yeah.

Q: Describe what happened next, Jackie, if you remember.

A: On the way to the ground and right when I hit the ground, I got stabbed in the leg.

Q: Okay.

A: And we was rolling around on the ground. That's when Eric Ryan started kicking this Tom dude. And then Tom got up, and him and Eric was fighting right then.

Q: Did you know that you had been stabbed at this point?

A: Yeah. I felt something in my leg.

Q: Did you ever see a knife?

A: No, I didn't.

Q: Did it hurt when you got stabbed?

A: Yeah.

Q: What did you think when you got stabbed?

A: That I got stabbed.

Q: Did it scare you?

A: Yeah, it scared me.

Q: Why did it scare you?

A: Because I figured I got stabbed once, I would get stabbed again.

Q: Okay. Where was Tom Knoedl at that point?

A: He was fighting with Eric Ryan.

Q: And what did you do?

A: I got up on one knee.

Q: Did you run back in the Blue Dolphin then?

A: I didn't.

Q: What did you do?

A: I pulled out my knife.

Q: And then what happened?

A: I stabbed him.

Q: Where did you stab him, now, or do you know? You remember where

you stabbed him? Were you on one knee at that point?

A: Yeah.

Q: Okay. Basically, what did you do with your knife?

A: I come around and stabbed him in the thigh or hip or something like that.

Q: Okay. What did he do at that point?

A: He kind of turned around more, facing me.

Q: What did you do then?

A: I came across and cut him through the middle somewhere.

Q: Excuse me. I couldn't hear that answer. What did you do then?

A: I came around and cut him through the middle.

Q: Did you know you cut him through the middle?

A: I didn't—I didn't think I had cut him at the time, because he didn't move.

Q: Okay. And what did you do?

A: I came back around to try to cut him again from another direction.

Q: Okay. What happened?

A: I fell over, and they took off running.

Q: Okay. what were you thinking— First of all, tell me how many—how much time had elapsed, now, from the time that he grabbed your T-shirt at the door until this point. How much time had elapsed? Minutes? Seconds? What?

A: A matter of just a few seconds."

At this point appellant got to his feet and bent over, feeling sick. He noticed a six inch swath of blood on his pant leg, but when he checked out the wound, "[i]t didn't seem that bad." Appellant's brother then appeared at the door, and the two of them followed Ryan and Knoedl out into the field. They found Ryan kicking Knoedl, who was on the ground. Appellant then helped Ryan carry Knoedl to the ditch across the road. Although the State's evidence had shown Knoedl's blood could be found on the portico, in the field, in a streak across the road, and in the ditch, appellant maintained he noticed neither massive bleeding nor the multiple stab wounds at this time. In fact, he testified, he did not learn of the number of wounds that had been inflicted until he was apprehended months later. He explained that when he learned Knoedl had died, he feared Knoedl had bled to death from the few wounds he had inflicted, and consequently he fled. The only wound he stated he was certain he himself had inflicted was a wound to Knoedl's back or buttock. He never saw Ryan with a knife.

Appellant repeatedly testified he never saw a knife in Knoedl's hand. He was equally persistent in maintaining that, upon being stabbed, he became "scared." Anticipating appellant's story, the State had earlier presented testimony from Knoedl's sister that Knoedl had lived with her and her husband for several years, that she had complete access to his room in her house, and that she had never known her brother to carry or own a knife. No knife was ever found at the scene or upon Knoedl's dead body.

At the close of the evidence the trial court charged the jury on the law of murder, voluntary manslaughter and aggravated assault, and the defensive issues of self defense and defense of a third person.

Thus the stage was set for final arguments. Early on the prosecutor emphasized that only if the jury believed Knoedl had in fact had a knife would self defense be a viable issue in the case, and that "[t]he mere fact they had mutually agreed to go out and settle their differences in a fight would not raise self-defense." Thus, straightaway the main point of contention was identified to be the credibility of appellant's claim he had been stabbed. It was stressed that no knife was found; that all the blood found at the scene was of Knoedl's rare blood type; that Knoedl had been shown to be so intoxicated as to have been virtually defenseless against attack (e.g., "This man was like a lamb facing a butcher[.]"); and that no evidence had shown Knoedl to be of a violent character.

Other aspects of the evidence were highlighted which were circumstantially inconsistent with appellant's claim of ignorance as to the amount of blood and the number of wounds inflicted. It was suggested that appellant killed Knoedl for "messing around with" Vause, girlfriend of his friend Mike Murray.

Defense counsel rebutted the State's argument that no knife had been found by assailing the thoroughness of the search conducted at the scene. He argued the evidence showed Knoedl could hold his liquor; and that there were aspects of Knoedl's character that his family did not know about. Turning to the court's charge, he touched only glancingly on voluntary manslaughter, thus:

> "Voluntary manslaughter is basically the same crime as murder, but then voluntary manslaughter is a killing that was done in sudden passion caused with an adequate cause. Sudden passion, adequate cause, they're all defined for you here."

After summarizing the remainder of the charge, emphasizing particularly aspects of self defense and defense of a third party (namely, Eric Ryan), counsel went on to point out that but for appellant's own testimony, the jury would never have heard what happened on the portico. He urged them to accept appellant's testimony, particularly that Knoedl had threatened to kill him and that appellant took the threat seriously:

> "Self defense is raised. Self defense is the overshadowing. It cries out imperatively that this is self-defense. Look at the evidence.
>
> *     *     *     *     *     *
>
> If Jackie Goff is lying to you, he didn't do a good job. But I submit to you that Jackie Goff gave you all he had while the State did not, and that makes Jackie Goff's testimony more believable than the State's. That makes Jackie Goff's evidence, which the State even uses, more credible than the rest of the evidence they've given you.
>
> *     *     *     *     *     *

> ... The self-defense exists. The State doesn't want to believe it because they can't get a conviction if they believe it...."

The State answered by once again stressing the absence of evidence that Knoedl had a knife, and went on to argue appellant's story was incredible, reminding the jury, *inter alia*, of his prior convictions which had been introduced as impeachment.

What emerges from the evidence and argument is that appellant's primary defensive posture at trial was two-fold: first, that he never anticipated using deadly force against Knoedl until after such force was first used against him, thus raising self defense; and second, although less apparent, that even then it was not blows from appellant that killed Knoedl, and he only fled because he did not know about the other, more serious wounds. (Presumably it is this latter position which gave rise to the charge on aggravated assault.) Clearly the paramount issue for jury determination was whether appellant had told the truth in claiming he had been (or at least reasonably believed he had been) stabbed first.

On this state of the record, and assuming *arguendo* that the evidence did raise an issue as to "sudden passion arising from an adequate cause," we hold that voluntary manslaughter was no more than an "incidental" theory in the case. *Lawrence v. State*, supra. Though not necessarily an "afterthought," as in *Lawrence*, "sudden passion" was quite obviously the least of appellant's priorities, judging from his presentation of the evidence and his argument, both of which emphasized the justification of his conduct under the law of selfdefense. As in *Lawrence*, we cannot here say that the unobjected-to jury charge error was "so egregious and created such harm that [appellant] has not had a fair and impartial trial."

For this reason the judgment of the court of appeals is affirmed.

ONION, Presiding Judge, concurring.

I concur in the judgment of the Court. Like the Court of Appeals, I do not believe

that the issue of "sudden passion" was raised.

CLINTON, Judge, dissenting.

I dissent to the majority's disposition of this cause for reasons articulated in my dissenting opinions in *Lawrence v. State*, 700 S.W.2d 208, at 215 (Tex.Cr.App.1986) and *Ex parte Chandler*, 719 S.W.2d 602 (Tex.Cr.App.). I would also take issue with the conclusion of the court of appeals that the issue of "sudden passion" was not raised in this cause.

The court of appeals concluded that appellant's testimony, liberally excerpted in the majority opinion, failed to raise the issue of voluntary manslaughter. Specifically the court found that, because appellant testified he wanted, in effect, to launch an initial sneak attack at the door, he therefore "was consciously aware of his actions and planned them out." 681 S.W.2d at 625. The court thus impliedly held that appellant's behavior lacked sufficient spontaneity to be construed as either "sudden" *or* "passion." [1] I disagree.

Treating first the court of appeals' intimation that any passion under which the killing might have taken place was not shown to be "sudden," I would note that the behavior "planned" by appellant did not contemplate the infliction of "serious bodily injury." [2] According to his testimony, as he approached the door appellant intended to use it to knock the deceased off balance to gain the upper hand so as to "hit" him. Such a scenario does not necessarily rule out the possibility that, once appellant's scheme was foiled, and he was then stabbed in the leg, such a passion suddenly arose in him as to induce him to commit an act clearly dangerous to the life of the deceased. Passion may be "sudden" under § 19.04(b), supra, which is not *solely* the result of former provocation. Here it is clear that appellant was provoked by Knoedl to the point of following him outside to engage in a fight. However, this does not exclude the possibility that the stab wound to appellant's leg was the further, incremental provocation which directly caused the sudden passion under which the killing occurred.

The facts of this case are distinguishable from those of *Daniels v. State*, 645 S.W.2d 459 (Tex.Cr.App.1983), cited by the court of appeals, and of *Hobson v. State*, 644 S.W.2d 473 (Tex.Cr.App.1983). In *Daniels* it was clear that the defendant reflected on the actual killing itself before committing it. The provocation claimed by the defendant in *Hobson* occurred during the morning, where as the killing took place later in the evening. In the case *sub judice* appellant anticipated a fight prior to the killing. But it is far from clear that he intended to inflict serious bodily injury to the deceased prior to his having been stabbed. A reasonable jury could have found "sudden" passion under these circumstances.

The court of appeals also implied that appellant's testimony failed to establish fear which rises to the level of terror, and concluded therefore that there was no sudden "passion" in the case. It is true this Court observed in *Daniels*, supra, that evidence sufficient to raise selfdefense, in combination with "a bare claim of 'fear,'" will not necessarily operate to establish "terror ... sufficient to render the mind incapable of cool reflection." Sec. 19.04(c), supra. Much mischief and misunderstanding has been engendered by this observation. See *Smith v. State*, 721 S.W.2d 844

---

1. V.T.C.A. Penal Code, § 19.04(b) and (c) read:

    "(b) 'Sudden passion' means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation.

    (c) 'Adequate cause' means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection."

2. That phrase is defined in V.T.C.A. Penal Code, § 1.07(a)(34) thusly:

    "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss of impairment of the function of any bodily member or organ."

(Tex.Cr.App.1986) (Clinton, J., concurring); *Gonzales v. State*, 717 S.W.2d 355 (Tex. Cr.App.1986) (Clinton, J., dissenting). In *Daniels* the defendant's own testimony on recrossexamination demonstrated that whatever fear he may have felt did not prevent him from reflecting on his situation before he acted. 645 S.W.2d at 460. See *Gonzales* supra. There was no such testimony in the present case. Appellant testified that he was "scared." Under the circumstances the jury would be entitled to infer that appellant's fear was such as to have rendered him incapable of cool reflection. See *Steen v. State*, 88 Tex.Cr.R. 256, 225 S.W. 529 (1920). The issue should have been submitted to the jury to decide (1) whether the deceased engaged in the provocative conduct, i.e., did he in fact stab appellant; (2) was appellant in fact provoked, i.e., did he in fact lose his capacity for cool reflection as a result of the provocative conduct; and (3) did that provocative conduct amount to "adequate cause" under § 19.-04(c). *Gonzales*, supra. It stretches credulity to say that the cause of appellant's purported fear, *viz*, the stab wound, and a reasonable prospect of another or more wounds, could *not* have been of such a nature as to render a person of ordinary temper incapable of cool reflection.[3] Manifestly, that determination should have been left to the jury.

Without always examining the factual details as precisely as I have done here, in a number of cases the Court has found evidence sufficient to warrant an instruction on voluntary manslaughter, or to uphold a finding that the offense was committed: *Humphries v. State*, 615 S.W.2d 737 (Tex.Cr.App.1981) (stabbing in course of heated argument); *Braudrick v. State*, 572 S.W.2d 709 (Tex.Cr.App.1978) (stabbing in escalating barroom brawl); *Lucky v. State*, 495 S.W.2d 919 (Tex.Cr.App.1973) (shooting

shortly after insulting conduct led to heated argument); *Parks v. State*, 473 S.W.2d 32 (Tex.Cr.App.1971) (stabbing during argument over dollar debt). Here also I would find that the record contains evidence sufficient to raise the issue of "sudden passion."

TEAGUE, Judge, dissenting.

For the reasons that I have expressed in the opinions that I filed in *Lawrence v. State*, 700 S.W.2d 208 (Tex.Cr.App.1985); *Castillo-Fuentes v. State*, 707 S.W.2d 559 (Tex.Cr.App.1986); *Moore v. State*, 694 S.W.2d 528 (Tex.Cr.App.1985); and *Daniel v. State*, 668 S.W.2d 390 (Tex.Cr.App.1984), I respectfully dissent.

---

**3.** Whether the wound was of such a *degree* of severity is perhaps another question: Appellant testified that, on later inspecting the wound, he concluded that "[i]t didn't seem that bad." Nonetheless it was reasonable for the trial court to find that, at the time and under the circumstances, the infliction of what turned out to be a not so serious wound might have frightened a person of ordinary temper to the point of losing his capacity for cool reflection. This is a classic example of an issue to be reserved for the trier of fact.