### Ex parte Helen Ann CHANDLER.

### No. 69488.

Court of Criminal Appeals of Texas, En Banc.

Nov. 19, 1986.

Robert M. Rose, Dallas, for appellant.

Henry Wade, Dist. Atty. and Ruth E. Plagenhoef, Asst. Dist. Atty., Dallas, Robert Huttash, State's Atty., Austin, for State.

---

## OPINION

PER CURIAM.

It is hereby ordered, adjudged and decreed that the application for Writ of Habeas Corpus was improvidently filed and set for submission. It is therefore ordered, adjudged and decreed that the application be denied without written order.

CLINTON, Judge, dissenting.

This is an application for postconviction relief pursuant to Article 11.07, V.A.C.C.P., from a judgment of conviction for murder in Cause No. F81–4489–T in the 283rd Judicial District Court of Dallas County. Implicated is our disposition of a similar application in *Ex parte Maldonado*, 688 S.W.2d 114 (Tex.Cr.App.1985), which in turn applied teachings of *Almanza v. State*, 686 S.W.2d 157 (Tex.Cr.App.1985) vis a vis *Ex parte Coleman*, 599 S.W.2d 305 (Tex.Cr. App.1978). See *Ex parte Maldonado*, supra, n. 2. Here, however, for reasons about to be developed we should reach a different result.

In essence applicant alleges that her confinement is unlawful because judgment of conviction is based on a verdict of guilty returned by a jury in response to a fatally defective charge by the trial court, thereby denying her due process of law and due course of law guaranteed respectively by the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States and by Article I, § 19 of the Constitution of the State of Texas, and also denying her right to trial by jury vouchsafed by the Sixth and Fourteenth Amendments and by Article I, § 10, respectively.

The trial court instructed the jury *inter alia* on the offense of murder and on the lesser included offense of voluntary manslaughter, undertaking *seriatim* to apply law to facts as to each offense. Specifically she points out the charge of the court to the jury is fundamentally deficient in this, *viz:*

"The court's charge to the jury at the guilt stage of the trial was fundamentally deficient because during the trial of this cause the evidence raised the issue that [applicant] acted under the immediate influence of a sudden passion arising from adequate cause, and in submitting the issue of murder to the jury the trial court wrongfully authorized the jury to convict this [applicant] of murder without consideration of the issue of sudden passion thereby committing fundamental error by authorizing the jury to convict this [applicant] of the offense of murder without properly placing the burden of proof upon the State to disprove the issue of sudden passion beyond a reasonable doubt ..." [1]

Further, the applicant reasons:

"Since the Court's instruction failed to properly place the burden of proof upon the State to disprove the issue of sudden passion, as raised by the evidence, this [applicant] was denied Due Process of Law because the trial court fundamentally failed to require the jury to find each and every element necessary to sustain this conviction for the offense of murder."

Without convening an evidentiary hearing the judge of the convicting court nevertheless prepared and caused to be filed findings of fact and conclusions of law.[2] Also, conformably with Article 11.07, § 2(d), the judge directed the clerk of the

---

1. Cited in that connection are *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *Jenkins v. State* (Tex. Cr.App. No. 64000, delivered February 16, 1983), pending on State's motion for rehearing; *Cobarrubio v. State*, 675 S.W.2d 749 (Tex.Cr.App.1983).

2. Among others are the following findings and conclusions:

1. There was no evidence which raised the issue of the existence of immediate influence of sudden passion from an adequate cause and thus the voluntary manslaughter instruction given in this case was not warranted.

3. The jury charge as a whole did not require the Applicant to prove that she was acting under the immediate influence of sudden passion from an adequate cause and therefore does not violate her constitutional rights to due process.

court to prepare a transcript of "all papers in this Cause" and to transmit to this Court designated papers in the original cause as well as "other exhibits and evidentiary matter filed in the *trial records* in this Cause, and *a copy of the Statement of Facts and Transcript in the appellate record ...*" [3]

Accordingly, unlike the application and record in *Maldonado,* applicant has supported her allegations with "adequate reasoning [and] argument," and the Court has before it the entire record made at trial.[4] There is no cause to dismiss the application. Therefore, we ought to examine its merits.

The deceased, Charles Price Williams, was killed by a bullet entering his brain.[5] The pistol that fired it was not at close range. An autopsy revealed that deceased had been intoxicated, for his blood ethynol level was .231 percent. While alive the deceased sustained three injuries: a "scrape" on the side of his left arm near the elbow, an abrasion below his left eye that produced in layman's language a black eye and, of course, the gunshot wound above the ear on the left side of the head. The events leading up to his death were retold by witnesses for the State and then applicant herself.

His brother, Arthur Williams, testified that while he and a woman companion were driving home from work the evening of March 31, 1981, he saw his brother's car parked at a familiar place on Avenue D and for personal reasons drove in a driveway and approached the car. Charles Williams joined him and they engaged in brotherly conversation for a few minutes until becoming aware of an automobile speeding towards them in the dark. As it was braked to a quick stop just behind Charles' car, Arthur noticed a woman was driving and remarked, "Man, whoever this broad is, she must be mad at somebody."

According to Arthur Williams, alone in the automobile, applicant stopped, then bent over and rolled down a window, calling out, "Charles, why did you do this," or something to that effect. Charles left his brother and started walking around the back of her car to approach the driver's side. As he neared the back bumper on that side, a shot rang out and Arthur saw a flash from inside the car. Charles ·fell. Applicant sped off in her car.

While Arthur tried to comfort his brother, his companion went to have someone call an ambulance. She testified substantially to the same account given by Arthur, but seems to believe the pistol was fired out the passenger window. After investigating officers told of responding to the scene and later arresting and confining applicant, the State rested.

In her defense applicant testified. She first saw Charles at the place where he later met his death and came to know him about two and a half years before his death. At an unspecified time they started a "relationship"—"going together"—that apparently developed from their both frequenting the place she called "the hole." She terminated their relationship in September 1980, but continued to see him at "the hole."

Charles was there with "some lady" earlier in the evening of March 31, 1981, at about 7:30 p.m., and left with her for a while. When he returned Charles approached and began saying something to applicant; she said they should not make a scene there, but go talk somewhere else.

In separate cars they drove to a park. Charles got out of his car, went to and opened its trunk, retrieved a pistol and straight away walked to applicant's car, opened the door and holding the pistol in one hand started beating her with his fist.

**3.** All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

**4.** The docket sheet indicates there were no pretrial proceedings; if voir dire of prospective jurors were taken down, the notes have not been transcribed.

**5.** Ordinarily we do not identify a deceased. However, as will be seen, in this cause his name becomes germane to a recitation of the facts.

Words were exchanged.[6] Saying "Charles, Charles, please, please, please don't shoot me," applicant fled to a yard of a nearby house and remained hidden in that vicinity until Charles got in his car and left. She drove to her own home, obtained a gun belonging to her parents and left again to seek protection of relatives who lived near and also visited "the hole," feeling that in those surroundings "Charles wouldn't bother me." She drove into a curved driveway, slowed for a crowd of people and at the opposite end saw Charles' car; she pulled into a short drive and there were Charles and Arthur; she turned around, putting Charles on her right side. Applicant asked, "Charles, what's wrong with you? I don't understand. Why did you do it Charles?" Charles walked around the back of her car, moving rapidly and saying, "I haven't did nothing yet. I'm going to finish you off."

Applicant testified that she was "afraid [for her life] because after he come out to me and told me that he was going to finish me off, I couldn't think of nothing else but that he meant to do it." As he rushed toward her, she "assume[d] he still had the pistol." The windows were down; saying, "Oh, no you ain't," she picked up the revolver from the driver's seat and without looking fired it lefthandedly through the window space.[7]

Immediately applicant sped off on a little street that leads onto the main avenue in front of "the hole," and drove four or five blocks over to a friendly place. She made several phone calls, one to a friend at the scene; somehow a sister learned where she was and called to tell her "what had happened." Prevented by an objection from relating details of their conversation, seemingly applicant learned she had killed Charles.

As a result of one call police officers were directed to her location, and when they arrived applicant "came forward." The arresting officer took her to a medical doctor in jail to examine her "swollen jaw;" he gave her some medication. Mug shots seem to show swelling in her *right* jaw, although an officer testified he could not tell from the photographs whether "that's swelling [in her *left* jaw] or just her size;" however, he was told by applicant "that she had been beaten up by the man she had shot."

Notwithstanding the belated assertion by the judge of the convicting court that "there was no evidence raising the issue of voluntary manslaughter," we find that the trial court was correct the first time when—without objection from either party—it instructed the jury on that issue. *Schoelman v. State,* 644 S.W.2d 727 (Tex. Cr.App.1983); *Medlock v. State,* 591 S.W.2d 485 (Tex.Cr.App.1979). Concomitantly, then, the trial court erred in failing to place upon the State its burden of negating sudden passion in the paragraph of the charge applying the law of murder to the facts of the case. *Bradley v. State,* 688 S.W.2d 847, 851 (Tex.Cr.App.1985); *Cobarrubio v. State,* 675 S.W.2d 749 (Tex.Cr. App.1984); *Lawrence v. State,* 700 S.W.2d 208 (Tex.Cr.App.1985) (Dissenting Opinion): "Thus the issue lies in a failure to give a correct instruction on murder, not in giving one on voluntary manslaughter." *id.,* at 218, n. 6.

The remaining inquiry is whether on the whole record bearing on the subject that error was such as to deprive applicant of a fair and impartial trial. *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Cr.App.1985); *Ex parte Maldonado,* supra, 688 S.W.2d at 116, n. 2, and to that matter we now turn.

In *Bradley,* supra, we determined that the *Braudrick* court "erred when it inter-

---

**6.** Charles said, "Helen, you don't know me. You don't know who you're playing with. You don't know me." She said, "Charles, don't do this. What's wrong with you? Don't do this, Charles. Stop." He repeated that she "just didn't know" him; she asked, "What have I did, Charles?" He said, "I'm going to finish you off

right here," and she begged, "Please, Charles, please."

**7.** Applicant is righthanded. Some confusion was engendered on crossexamination as to whether she shot through space on the passenger side or driver's side.

preted 'sudden passion' to be 'in the nature of a defense to murder,'" *Braudrick v. State,* 572 S.W.2d 709 (Tex.Cr.App.1978), and expressly disapproved of that concept. *Bradley,* at 849–850 and n. 3. Instead, after reexamining the reasoning of *Braudrick* in another aspect we concluded:

> "Thus, when the evidence raises the issue of 'sudden passion,' its negation becomes *an 'implied element' of murder.* Sudden passion is, in essence, a circumstance surrounding the forbidden conduct, see V.T.C.A. Penal Code, § 1.07(a)(13)(A), *the existence of which the State must refute beyond a reasonable doubt.*" [8]

Accordingly, in these premises an *Almanza-Maldonado* review for "egregious harm" must be undertaken in light of the proposition that error lies in an incorrect application of law to facts by omitting "an implied element" of murder on which the State had the burden of proof, rather than error in failing to charge on "a defensive issue." [9]

As applicable here Article 36.14, V.A.C. C.P., required the trial court to "deliver to the jury.... a written charge distinctly setting forth the law applicable to the case." That is to say, the charge of the court shall "clearly apply the law [under which the accused is prosecuted] to the very facts of the case." *Harris v. State,* 522 S.W.2d 199, 202 (Tex.Cr.App.1975). The jury must be instructed "under what circumstances they should convict, or under what circumstances they should acquit," *ibid.*

Demonstrably shown *ante,* "sudden passion" was raised first by evidence presented by the State and then supplemented by testimony from applicant. Clearly it was an issue in the case, and neither objected to including in the charge instructions on voluntary manslaughter. Much like the format in *Cobarrubio,* supra, the charge first applied the law of murder to the facts and then instructed the jury as follows:

> "Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant of the offense of murder, and consider whether [s]he is guilty of the *lesser offense* of voluntary manslaughter."

The charge then applied the law of voluntary manslaughter to the facts with instructions routinely given by trial courts. See *Cobarrubio,* at 751–752, n. 8. Thereafter it charged on selfdefense. The charge was, of course, read to the jury before argument of counsel.

In his opening argument one prosecutor dismissed applicant's testimony about being beaten by Charles in a park as "uncorroborated," but he did recognize and acknowledge "that something happened and that *it made her mad* [because the testimony of Arthur Williams] would leave *no doubt but that she was mad.*" Opining that "whatever [had happened] had passed" so far as Charles was concerned, he argued:

> "But not for some of us. One person at least [pointing to Defendant] was not going to let it go, and she drove up there and slammed on the brakes, pulled up behind the car, pulled back and came

---

**8.** Given that understanding, *Bradley* went on to explicate when a correct charge on murder and voluntary manslaughter must be given, *viz:*

"*Should the evidence raise 'sudden passion,'* the absence thereof would constitute a 'fact' which is engrafted upon the elements of murder under § 19.02, and must be established beyond a reasonable doubt *before a murder conviction can be obtained.* A charge on voluntary manslaughter becomes necessary to authorize a conviction in the event a jury finds the State has established all of the elements of § 19.02, but has failed to establish the 'fact' that sudden passion was absent."

*Bradley,* supra, at 851.

**9.** Because *Braudrick* had held that sudden passion "is in the nature of a defense to murder," *Cobarrubio* also was couched in terms of "the defensive issue of sudden passion." Similarly, *Lawrence v. State,* supra, speaks of voluntary manslaughter "as a defense to murder," *id.,* at 211. Since *Bradley,* supra, however, when raised by the evidence "sudden passion" becomes a issue in the case to be resolved by a jury under proper instructions from the court. As it developed in the instant cause, "sudden passion" is not a "theory" advanced by either party—it is an issue raised by testimony of witnesses and applicant.

alongside. .... Everybody said she spoke first. 'Why do you want to treat me like that?' Or whatever it was."

Then recounting movements leading to the homicide and after, the prosecutor charged that applicant sped away to have "some time to think about it," and thus decided:

"... The best thing to do is try and make it to look like some kind of accident or make it look like self-defense or some kind of *crime of passion*.... Not this time, ladies and gentlemen. .... This woman [pointing to Defendant], *without adequate cause*, not in self-defense, for no reason other than just wanting to take the life of another person, killed Mr. Williams, murdered him, and nothing less."

For his part attorney for applicant argued briefly, taking so little time that his entire summation is reported in four and a half pages. Essentially he contended that "she did not go over there with the intention of shooting him;" he discussed the beating in the park and the injury inflicted by Charles and submitted that upon seeing him later at "the hole" she "had a reasonable fear" that he would cause more injury. Counsel ended by asserting the evidence showed applicant acted in selfdefense.

Closing for the State the lead prosecuting attorney addressed issues in the charge *seriatim.* First she directed the jury's attention to the "guilty" verdict form, and she asked the foreman to "fill in that first verdict form" because the testimony proves "beyond any doubt whatsoever, that this Defendant is guilty of the offense of murder." That done, however, she then proceeded to address that part of the charge instructing the jury on voluntary manslaughter and, assuming the jury "should find that she acted under sudden passion," the prosecutor insisted jurors must "look at the evidence to see what provocation the deceased gave at the offense."

On that score, considering the photograph and testimony of officers that they saw her swollen jaw, the State was willing to concede that Williams "may have hit her," but that was before she went home,

got a gun and drove to Avenue D; there was no provocation at "the hole." Although applicant "was angry because 20, 30, 40, 50 minutes earlier he hit her in the jaw and caused her jaw to swell,.... [t]hat's not what the law says, and you are bound to follow the law." The passion, she said, "was not the result of former provocation."

Still on the subject of sudden passion, the prosecutor turned to "adequate cause," contending, "All the evidence proves she did have plenty of time for cool reflection." *Ergo* there was no adequate cause; applicant was not acting under sudden passion and "voluntary manslaughter is not applicable under this evidence." (In contrast to length of argument by counsel for applicant, her argument on sudden passion alone consumes five pages.)

Only then did she move to address the charge instructions pertaining to the issue of selfdefense, and finally to conclude by reprising her opening remarks about "only one just verdict that can be reached." Incorrectly instructed as to the burden on the State to negate sudden passion, the jury did just that.

Dissenting in *Cobarrubio*, Judge McCormick premised his opinion on the notion we discarded in *Bradley*, supra, i.e., "this issue of 'sudden passion' does in fact seem to be a defense to murder and as a matter of burden of proof is to be treated like a defense." 675 S.W.2d at 753. The same notion underlies the formulation in *Lawrence v. State*, 700 S.W.2d 208 (Tex.Cr. App.1985). Apparently because counsel for accused there expressed his belief that "this is a classic case of self-defense," this Court ventured that under the circumstances, "Voluntary manslaughter, *as a defense to murder*, seems to have appeared in the case as an afterthought." *Id.*, at 211. Later in the opinion the Court opined that the record shows "voluntary manslaughter is an incidental theory of the defense." *Id.*, at 753. Here, however, neither is true: the court charged on voluntary manslaughter as a *lesser included offense* because sudden passion was raised by evidence

presented first by the State and later by applicant—as candor impelled both prosecutors to recognize and acknowledge before the jury.

An issue of sudden passion thus raised by evidence need not be a "theory" claimed by one party or the other—it exists independently in the evidentiary facts of the matter. *Daniel v. State,* 668 S.W.2d 390, 393 (Tex.Cr.App.1984). Since due process and due course of law require the State "to prove beyond a reasonable doubt the absence of heat of passion on sudden provocation when the issue is properly presented in a homicide case," *Mullaney v. Wilbur,* 421 U.S. 684, 704, 95 S.Ct. 1881, 1892, 44 L.Ed.2d 508 (1975), it follows that when evidence raises an issue of whether an accused "caused the death under the immediate influence of sudden passion arising from an adequate cause," V.T.C.A. Penal Code, 19.04(a), the trial court must include in its charge the law applicable to that issue—quite aside from desires of parties in the case. *Humphries v. State,* 615 S.W.2d 737, 738 (Tex.Cr.App.1981). The essence of applicable law is that the burden is on the State to prove beyond a reasonable doubt that an accused did *not* cause death under the immediate influence of sudden passion, and it was derived by the Supreme Court of the United States from its own seminal decision of *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), holding that due process requires the prosecution prove beyond a reasonable doubt every fact necessary to constitute the crime charged. *Mullaney v. Wilbur,*

supra, 421 U.S. at 685, 697–701, 95 S.Ct. at 1883, 1888–1891.

Now that "the burden is on the prosecution in Sec. 19.02, supra, [and] the Texas murder statute and the holding in *Bradley,* supra, are harmonious with the holding in *Mullaney,* supra," *Lawrence,* supra, at 213, when evidence from any source raises the issue it follows that in making an "egregious harm" analysis we err in a helter-skelter characterization of "sudden passion" as "an incidental theory of the defense," *ibid.* The essence of such harm is in relieving the State of its burden and thereby authorizing the jury to convict an accused of murder on less proof than required by due process and due course of law. *Mullaney* and *Winship,* both supra.[10]

In the instant cause that "sudden passion" was a very live issue is evident from facts, jury instructions and argument by counsel for both parties. Consequential harm to applicant from deprivation of due process and due course of law is equally evident. She suffers a sentence of confinement for thirty years, whereas had the jury been properly instructed she may well have been convicted of a lesser included offense carrying a maximum punishment of twenty years.

Furthermore, there are "societal interests in the reliability of jury verdicts." *Mullaney v. Wilbur,* supra, quoting from *Winship,* supra. The *Mullaney* court concluded "[that] a defendant can be given a life sentence when the evidence indicates

---

10. Also untenable is the idea that counsel for accused asserting selfdefense must argue expressly for voluntary manslaughter in order to sustain that high degree of harm otherwise attending a failure to instruct the jury as to the State's burden of disproving "sudden passion" beyond a reasonable doubt. The two are not mutually exclusive from an evidentiary standpoint. *Medlock v. State,* 591 S.W.2d 485, 487 (Tex.Cr.App.1979); *Lewis v. State,* 89 Tex.Cr.R. 345, 231 S.W. 113 (1921). That counsel invokes the protection of selfdefense while arguing facts equally applicable to elements of voluntary manslaughter does not mean he has relegated the latter to "an incidental theory," such that the trial court may be excused from giving a correct

charge on murder in the first place. Where, as here, the trial court includes in its charge an ordinary instruction on voluntary manslaughter as a lesser included offense to murder, and counsel argues facts of selfdefense that also implicate elements of voluntary manslaughter without specifically identifying them as such, we should not require that counsel run the greater risk of demanding that his client be found guilty of a lesser included offense in order to predicate a claim of deprivation of due process and due course of law through fundamental error committed by a trial court in instructing the jury as to elements it must find to convict him of the greater offense.

 

that it is *as likely as not* that he deserves a significantly lesser sentence is an intolerable result in a society where ... it is far worse to sentence one guilty only of manslaughter as a murderer than to sentence a murderer for the lesser crime of manslaughter." *Mullaney,* supra, 421 U.S. at 703, 95 S.Ct. at 1893.[11]

11. Emphasis by the Supreme Court.

For the foregoing reasons I respectfully dissent to the denial of relief in this cause.