Robert Paul JENKINS, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 64000 to 64004.

Court of Criminal Appeals of Texas, En Banc.

Feb. 16, 1983.

On Rehearing Nov. 4, 1987.

Randy Taylor, Dallas, for appellant.

Henry Wade, Dist. Atty. and Stanley Keeton, Reed Prospere, Gerry Holden Meier and Jeffrey B. Keck, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

## OPINION

TEAGUE, Judge.

On September 13, 1978, Robert Paul Jenkins, appellant, reached a plea bargain agreement with a prosecuting attorney of Dallas County concerning the disposition of four felony cases then pending against him in Dallas County. Previously, on July 10, 1978, appellant was tried by a jury for committing one of the four offenses; burglary of a habitation belonging to William J. Amos. He was found guilty and the trial judge assessed punishment at six years' confinement in the penitentiary. On August 21, 1978, appellant's motion for new trial was granted. This offense was included in the above plea bargain agreement. The plea bargain agreement consisted of appellant pleading guilty to each of the four felony offenses in exchange for a recommendation from the prosecuting attorney to the trial court that his sentences be probated. Pursuant to the agreement, appellant pled guilty to each of the four charges; two offenses of felony theft of the third degree, (thefts of automobiles), and one offense of burglary of a habitation, which offenses were all committed on December 26, 1977, wherein William J. Amos was alleged to be the complaining witness in all these offenses, and pled guilty to one offense of burglary of a habitation, which was committed on October 14, 1976, wherein Emily Dean Haley was the complaining witness in that cause. Upon recommendation of the prosecuting attorney, the trial court placed appellant on adult probation for a period of ten years. Appellant does not challenge the validity of any of the underlying convictions which resulted in the probations. Because we do not have a transcription of the trial proceedings, we do not pass on the validity of those convictions. See *Wolfe v. State*, 560 S.W.2d 686 (Tex.Cr.App.1978). On September 26, 1978, the State filed motions to revoke the above probations because the appellant had allegedly violated condition (a) of the probations, which condition mandated that he "Commit no offense against the laws of this or any other State or the United States." It was alleged in the motions to revoke that on September 23, 1978, appellant had murdered a person by the name of James Timothy Roche, Jr., and had also on the same day attempted to murder a person by the name of Daniel Wood Caskey. The allegation concerning Caskey was subsequently withdrawn by the prosecution. On February 21, 1979, a jury found appellant guilty of causing the death of Roche, and assessed punishment at 75 years' confinement in the penitentiary. On February 22, 1979, the trial court entered orders revoking each of the above probations, and assessed punishment on three of the causes at ten years' confinement in the penitentiary. However, as to the offense for which appellant had been previously assessed six years' confinement in the penitentiary, the trial judge reduced the ten year sentence he had imposed on September 13, 1978, to six years.

In the appeals from the orders revoking the four probations, appellant raises the same ground of error: "The trial court abused its discretion in revoking Appel-

lant's probation, as the cause for revocation of probation was not established by the evidence, i.e., violation of condition 'a'." He raises in his appeal from the conviction for causing the death of Roche several unrelated grounds of error. We have consolidated the appeals and will reverse appellant's conviction for causing the death of Roche and affirm the orders revoking the probations.

On February 22, 1979, implicitly using the *Barrientez v. State*, 500 S.W.2d 474 (Tex.Cr.App.1973)—*Bradley v. State*, 564 S.W.2d 727 (Tex.Cr.App.1978), line of cases, the trial judge took judicial notice of appellant's trial concerning the death of Roche, and ordered all four probations revoked. With the exception of one sentence, which as noted was reduced to six years, the appellant was ordered to serve ten year sentences in the other three causes, with all sentences to be served concurrently. As previously noted, appellant's punishment for causing the death of Roche was assessed by the jury at 75 years' confinement in the penitentiary.

■ Although appellant does not challenge the sufficiency of the evidence to sustain his conviction for causing the death of Roche, he, nevertheless, challenges the sufficiency of the evidence to sustain the orders revoking the probations. In a probation revocation proceeding, a preponderance of evidence standard is applied and met "when the greater weight of the credible evidence before the court creates a reasonable belief that a condition of probation has been violated as alleged." *Martin v. State*, 623 S.W.2d 391, 393, fn. 5 (Tex.Cr. App.1981). Because of appellant's contention in the probation revocation appeals, we will briefly summarize the facts of the case as adduced at the trial which concerned the death of Roche. Because the respective attorneys for the parties do not appear to be in any great disagreement over the facts, we will combine the various summaries they have presented in their respective briefs in order to make our summary of the facts, except where we believe further facts are necessary for the reader's understanding of what happened on that event-

ful night of September 23, 1978, at a location on Highway 183, between the cities of Dallas and Fort Worth, which resulted in the death of Roche. Where we find the facts as set out in the briefs lacking, we will add facts from the record to those stated by the attorneys.

On the evening of September 23, 1978, three students from Texas Christian University in Fort Worth, Tim Roche, Dan Caskey, and Warren Mackey, decided to go to the City of Dallas, "for some barhopping". The three went in Caskey's 1967 Pontiac Firebird, which apparently was a "classic" automobile. Shortly after midnight, after their "barhopping" episode had ended, the three decided to return to Fort Worth, with Caskey driving, Roche riding in the front seat, and Mackey sitting in the backseat. Enroute to Fort Worth, Caskey saw another automobile which was in all things identical to his vehicle. The second Firebird was shown to belong to appellant, but when Caskey saw the vehicle appellant's girlfriend, Toni Pratt, was driving it, with appellant riding therein as the sole passenger. Caskey drove his vehicle near the front of appellant's vehicle. As to what then occurred, the facts are not in agreement. From appellant's standpoint, the occupants of Caskey's vehicle commenced "harassing" Pratt. By Caskey and Mackey's version of the facts, Roche hollered to appellant and Pratt, and stated what a "good looking" automobile Pratt was driving. Whatever the reason, then commenced what was described by appellant's counsel in his brief as a bottle-shaving cream throwing, high-speed chase between the respective occupants and their vehicles. Caskey testified that he believed some bottles, which were thrown from appellant's vehicle, struck his vehicle. He thereafter chased appellant's vehicle in an attempt to stop it and determine whether his vehicle had been damaged by the thrown bottles. The testimony also showed that a can of shaving cream was tossed from appellant's vehicle into Caskey's vehicle, and then tossed back toward appellant's vehicle. Thereafter, with Caskey's vehicle trying to "catch" appellant's vehicle, a chase ensued, with the vehicles, depending on which witness you

believe, possibly reaching speeds up to 90 miles per hour. Appellant and Pratt testified that they were merely trying to escape from Caskey and the occupants in his vehicle, being in fear they were going to be harmed. The chase lasted approximately ten minutes, culminating in Pratt parking appellant's vehicle at an apartment complex, with Caskey parking his vehicle in front of appellant's vehicle. Before any of the occupants of the Caskey vehicle could get out of their vehicle, the right front passenger window on Caskey's vehicle was broken when appellant threw a Dr. Pepper bottle at the window. Appellant testified that at that time he believed Caskey, Roche, and Mackey were in the process of getting ready to leave their vehicle and attack him. Apparently, Roche was the first person to exit the Caskey vehicle. Soon thereafter, Roche stumbled into a nearby vacant field and fell face down. Caskey testified that prior to this time, he saw appellant at the rear of Caskey's vehicle, where appellant uttered the words "come on fucker." Appellant testified that Caskey, Roche, and Mackey also made some uncomplimentary and threatening statements to him during that period of time. By the time Caskey and Mackey got out of their vehicle, Roche was lying in the nearby field. It was later shown that Roche had been stabbed with a knife and had died as a result of the stab wound. Appellant and Caskey subsequently fought each other. During this period of time, Mackey had armed himself with a rubber mallet, which had been in the backseat area of Caskey's vehicle. There is no evidence, however, that Mackey ever attempted or used the mallet. Soon thereafter, Pratt, who had left the scene, returned with a weapon, a shotgun, after which appellant and Pratt told Caskey and Mackey "to get the hell out of there." When Caskey and Mackey were attempting to assist Roche, appellant and Pratt then left the scene in appellant's vehicle. By that time, Roche was dead. Subsequently, Caskey and Mackey summoned the police, who investigated the incident. Appellant denied intentionally stabbing Roche, claiming that while defending himself from attack by all three of the occupants of the Caskey vehicle, and while "slashing and cutting" at them, he may have unintentionally stabbed one of them. Appellant surrendered to the police the next day and gave a written statement of his version of what had happened that night. The statement, however, was not introduced into evidence during the trial.

■ In his seventh ground of error, appellant claims that the evidence is insufficient to establish a violation of condition "a" of the conditions of probation, that he not violate any law against the laws of this State. At the trial for the death of Roche, the jury was instructed on, among other things, the law of self-defense. If we understand appellant's contention under his ground of error, it is that he established self-defense as a matter of law. However, "The issue of self-defense, which was an issue of fact, was resolved by the jury against appellant and the evidence, although very close, supports that determination. *Silva v. State*, 546 S.W.2d 618 (Tex. Cr.App.1977); *Sloan v. State*, 515 S.W.2d 913 (Tex.Cr.App.1974)." *Puckett v. State*, 640 S.W.2d 284, 287 (Tex.Cr.App.1982). In *Parkman v. State*, 149 Tex.Cr.R. 101, 191 S.W.2d 743 (Tex.Cr.App.1946), this Court stated that "in order for a reviewing court to hold, as a matter of law, that a defendant in a homicide prosecution killed in self-defense, the evidence must be uncontradicted and no issue thereon presented for the jury's determination. *Parker v. State*, 138 Tex.Cr.R. 478, 136 S.W.2d 229; *Patton v. State*, 129 Tex.Cr.R. 269, 86 S.W.2d 774." Although we agree with appellant's implicit contention that there was a sharp conflict in the evidence as to self-defense, we are unable to agree that the evidence was totally uncontradicted. The jury, therefore, was free to accept or reject appellant's defense of self-defense. The evidence supports the jury's verdict, which, by finding appellant guilty, implicitly rejected the appellant's defense of self-defense. Also see *Garcia v. State*, 454 S.W.2d 400, 406 (Tex. Cr.App.1970); *Powers v. State*, 497 S.W.2d 594, 596 (Tex.Cr.App.1973). Appellant's seventh ground of error is therefore over-

ruled, and the orders revoking appellant's four probations will be affirmed.

■ Appellant has raised numerous grounds of error in his appeal from his conviction for killing Roche. We have carefully reviewed each ground of error and have concluded that none have merit. However, we are unable to affirm appellant's conviction because we have found fundamental and reversible error in the trial court's charge. See Art. 40.09, Sec. 13, V.A.C.C.P., prior to amendment. The primary offense alleged against appellant, as set out in the indictment in this cause, was for "intentionally and knowingly causing the death of James Timothy Roche, Jr. an individual, by stabbing the said James Timothy Roche with a knife." The trial court's application paragraph of the charge merely tracked the allegations of the indictment. Recently, this Court, in *Cobarrubio v. State*, 675 S.W.2d 749 (Tex.Cr.App.1983), pointed out that "[not only must] the burden of proving the lack of sudden passion ... be placed upon the prosecution, but also ... this burden must be so placed in the paragraph of the charge applying the law of murder to the facts of the case." In this instance, the trial court additionally charged on the offenses of voluntary manslaughter and aggravated assault. The offense of voluntary manslaughter contains the same elements as the offense of murder except that "causing death 'under the immediate influence of sudden passion arising from an adequate cause' is in the nature of a defense to murder that reduces the offense to the lesser included offense of voluntary manslaughter, and ...the State need not prove such influence beyond a reasonable doubt to establish voluntary manslaughter, but that if raised by the evidence [the State] must prove the absence of such influence beyond a reasonable doubt to establish murder." *Braudrick v. State*, 572 S.W.2d 709, 710 (Tex.Cr. App.1978). In *Cobarrubio v. State*, supra, this Court stated at p. 752:

> With the defensive issue of sudden passion deleted from the paragraph of murder and placed *only* in the voluntary manslaughter paragraph as it is here, there exists a decided likelihood that a

jury would affirmatively answer the murder paragraph, never having considered the defensive issue of sudden passion which would reduce the offense of murder to the lesser included offense of voluntary manslaughter. Thus, if the jurors followed the court's instructions to the letter—indeed, we must presume they did—the state's burden of proof was significantly diminished and appellant was denied an opportunity to have the jury determine his guilt on the issue of murder as interpreted by the Court in *Braudrick*, supra. Under these circumstances, this error precipated a denial of due process of law in the most fundamental sense.

■ Also see *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *Hankerson v. North Carolina*, 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed.2d 306 (1977); *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977); *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). In *Mullaney*, supra, the Supreme Court held that "the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." 421 U.S. at 703, 95 S.Ct. at 1892, 44 L.Ed.2d at 522. It logically follows, when applicable, that a jury must be so properly instructed by the trial court. See *Doyle v. State*, 631 S.W.2d 732 (Tex.Cr.App.1982) (On State's Motion for Rehearing). In this instance it was not so charged. Appellant's conviction for causing the death of Roche will therefore be reversed because the charge to the jury is fundamentally defective.

■ Our decision reversing appellant's conviction for causing the death of Roche does not have any effect on our decision affirming the trial court's orders revoking appellant's probations. Appellant did not object to the State's motions to revoke nor did he request the trial court to make any findings regarding the orders revoking the appellant's probations. The trial court, when it granted the State's motions to re-

voke, and ordered appellant's probations revoked, implicitly adopted the verdict of the jury finding that the appellant unlawfully caused the death of Roche, "as charged in the indictment". Appellant in his appeal does not challenge the verdict of the jury. We therefore hold that the orders of revocation are supported by sufficient evidence, albeit they encompass the jury's verdict in the murder case. In any event, before it would be necessary to reverse the orders of revocation, because of insufficiency of the evidence, it would be necessary for us to also find that the State failed to prove by a preponderance of the evidence not only the greater offense of murder, but we would also have to find that the State failed to establish by a preponderance of the evidence that the appellant was guilty of any lesser included offenses of the murder offense. See *Hancock v. State*, 491 S.W.2d 139, 141 (Tex.Cr.App.1973); *Pickett v. State*, 542 S.W.2d 868, 869, 870 (Tex.Cr.App.1976); *Roberson v. State*, 549 S.W.2d 749 (Tex.Cr.App.1977); *Littlefield v. State*, 586 S.W.2d 534 (Tex.Cr.App.1979); *Horton v. State*, 621 S.W.2d 632 (Tex.Cr.App.1981). In the cause for which appellant was convicted of causing the death of Roche, the evidence not only supports the jury verdict finding appellant guilty of that offense, but the jury would have been warranted in finding appellant guilty of either the offense of voluntary manslaughter or the offense of aggravated assault, on which the jury was instructed.

The judgment of conviction for causing the death of Roche is reversed and remanded for a new trial. The orders revoking appellant's probations are affirmed.

ONION, P.J., and CLINTON, McCORMICK and CAMPBELL, JJ., concur is the result.

1. Appellant was convicted of this offense on February 21, 1979. Sentence was pronounced on March 21, 1979. Notice of appeal was filed on March 26, 1979. At the time of appellant's conviction, the Code of Criminal Procedure provided that all appeals in felony cases be heard by the Court of Criminal Appeals. Article 4.03,

## OPINION ON STATE'S MOTION FOR REHEARING

McCORMICK, Judge.

Appellant was convicted of the murder of James Timothy Roche and was assessed a prison term of seventy-five years. Appellant appealed this conviction to this Court. This appeal was consolidated with appellant's appeal of the revocation of his probation in four other cases.

 In an opinion handed down on February 16, 1983 (see page 435), the Court affirmed the four cases in which appellant's probation had been revoked. After reviewing the grounds of error raised as to the murder conviction, the Court concluded they had no merit.[1] However, the conviction was reversed because of unassigned fundamental error in the court's charge. A review of the charge revealed that not only had the trial court charged the jury on the primary offense of murder, but also the lesser included offenses of voluntary manslaughter and aggravated assault. Relying on this Court's opinion in *Cobarrubio v. State*, 675 S.W.2d 749 (Tex.Cr.App.1983), the Court found that the portion of the court's charge applying the law of murder to the facts of the case failed to require the State to prove the lack of sudden passion. It was held that this lapse constituted fundamental error.

The State filed a motion for leave to file a motion for rehearing.

After the opinion on original submission was delivered, this Court radically altered the procedure for reviewing error in the court's charge to the jury. *Almanza v. State*, 686 S.W.2d 157 (Tex.Cr.App.1985). In *Almanza*, this Court abandoned the concept of fundamental error in the jury charge and instead adopted a two part test to be used in examining allegations of jury charge error. The first step, of course is to determine if the charge contains error.

V.A.C.C.P. In addition, at the time this case was heard on original submission Article 40.09(9), V.A.C.C.P. (1981), provided that the briefs contain "grounds of error." Now pursuant to Tex. App.Proc.Rule 74(d), on original submission to the courts of appeal, briefs will contain "points of error."

If error is present, then the reviewer moves to the second step—the harm analysis. If the error was the subject of a timely objection, then reversal is required if a review of the record indicates that the appellant suffered *some* harm as a result of the error. If there was no objection to the charge, then reversal is mandated only if the record reveals that the error caused egregious harm.

This Court has applied the *Almanza* analysis to cases involving *Cobarrubio* error on several occasions. In *Lawrence v. State*, 700 S.W.2d 208 (Tex.Cr.App.1985), this Court held that *Cobarrubio* error, although error, was not per se reversible error and thus if a defendant failed to object to the charge at trial, a showing of egregious harm had to be made before reversal would result. Of particular importance to the instant case was the following language in Judge Campbell's opinion:

"Judge Clinton opined in *Cobarrubio*, supra, that the failure of a trial court to charge in accordance with *Cobarrubio* 'precipitated a denial of due process of law in the most fundamental sense,' 675 S.W.2d at 752, and perforce constituted fundamental error. We cannot accept this position as being consistent with this Court's holding in *Almanza*. Such an application of the doctrine of fundamental error ignores the necessity of a finding of *actual egregious harm* as *Almanza* requires. To the extent that *Cobarrubio* held that jury charge 'error precipitated a denial of due process of law in the most fundamental sense,' *Cobarrubio* at 752, it is overruled. 'Cobarrubio error' will be assayed in light of our holding in *Almanza*.

"Judge Teague, along with the court of appeals, posits his argument that, *Cobarrubio* error is fundamental error of *federal constitutional dimension,* [emphasis added] primarily on *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). Cf. *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). In *Mullaney*, the Maine statute prescribed that a *defendant prove* by a fair preponderance of the evidence that he acted in the heat of passion on sudden provocation in order to reduce murder to manslaughter. The Supreme Court held that 'the due process clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly raised in a homicide case.' *Mullaney*, supra [421 U.S.] at 704, 95 S.Ct. at 1892. The Maine *statute* was thus found to be infirm, the burden not being placed on the State to prove every element of its case beyond a reasonable doubt. See *In Re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

"In this state, the burden is on the prosecution in Sec. 19.02, supra, a fact that we confirmed only recently in *Bradley*, supra. See ante, p. 215. Thus, we find that the Texas murder statute and the holding in *Bradley*, supra, are harmonious with the holding in *Mullaney*, supra.

"Even if we concede, as does our brother Teague, that the error in the instant case was of federal constitutional dimension, we know of nothing in the law that saves appellant from her failure to object to the charge. Our state law provides that any such objection or refusal of any specially requested charge 'shall be made at the time of the trial.' Art. 36.19, V.A.C.C.P. It is this failure by the appellant that is the backbone of the holding in *Almanza*, supra." 700 S.W.2d at 213.

See also *Castillo–Fuentes v. State*, 707 S.W.2d 559 (Tex.Cr.App.1986).

As noted above, this Court on original submission reviewed the error in the jury charge even though it was unassigned because it was fundamental error. Since we have determined that such error is no longer fundamental error, it follows that our review of such unassigned error was error itself. Because appellant did not argue such a ground in his brief, we now hold that there is nothing for this Court to review.

However, even if appellant had made such an argument in his brief, given the record before us, we would be compelled to

find no egregious harm. According to the State's witnesses, three Texas Christian University students, Tim Roche, Dan Caskey, and Warren Mackey, decided to go to Dallas with some of their fraternity brothers for a night of bar-hopping. The three drove to Dallas in Caskey's 1967 Pontiac Firebird. Shortly after midnight as they were heading back towards Fort Worth, they saw a car of the same model and color as Caskey's car. They pulled alongside the car and saw that it was being driven by a young female accompanied by a male passenger. Caskey drove alongside the other Firebird for some distance while Roche, who was sitting on the passenger side of the front seat attempted to get the other car to pull over so they could look at it. For some reason, the male passenger in the second Firebird, who was later identified as appellant, sat up on the window sill of the passenger side of the car and began throwing objects at Caskey's car. After several objects hit Caskey's car, the second Firebird sped off. Caskey, wanting to catch the second Firebird and ascertain if the driver would pay for the damage caused to the car as a result of the thrown objects, pursued the second Firebird. Thereupon a ten minute high speed chase ensued until the second Firebird pulled up to the front of an apartment complex. Caskey pulled his car up in front of the second Firebird. Before the three TCU students could exit the car, something crashed through the right front window, sending glass fragments all over the interior of Caskey's car. Caskey and Mackey then exited from the driver's side of the car. Mackey testified that as he got out of the back seat area of the car he grabbed a rubber mallet that was laying in the back seat area. By the time he had actually exited the car, he looked over and saw Roche, the victim stumbling into an adjacent field. He saw Caskey standing at the rear of the car and appellant was sitting on the ground. Mackey ran over to the victim who was laying face down on the ground, looked at him and then ran back to where Caskey was standing. At this time he noticed that appellant was holding a knife and Caskey had blood all over the front of his shirt.

Appellant and the female got in the car and left the scene.

Caskey's testimony regarding the beginning of the incident was similar to Mackey's. However, Caskey testified that after the front passenger window had been broken and he had gotten out of the car, he looked for his friends and saw the victim laying in the field. He then turned and saw the appellant in a crouched position at the end of the car. Appellant said "Come on fucker, come on fucker." The two began fighting and sometime during this struggle appellant stabbed Caskey in the stomach. The fight ended when Caskey hit appellant in the face and appellant fell to the ground.

The appellant took the stand in his own defense and testified that when the TCU students began driving alongside them, he and his girlfriend were afraid that the people in the other car intended to harm them. Appellant admitted that he threw several objects at Caskey's Firebird during the chase and after that Caskey tried to run them off the road. Appellant related that when his girlfriend stopped the car in front of the apartment complex, he got out the passenger side of the car and told his girlfriend to go get help from someone in the apartment complex. He stayed by the car while his girlfriend went for help. He watched the three students get out of their car and saw Mackey holding the hammer in his hand. Panicking, he threw a Dr. Pepper bottle at their car and broke the front passenger window. Appellant testified that one of the three students struck him and he fell to the ground. Then they all began kicking and beating him. While he was on the ground, he managed to pull his pocket knife out of this right front pocket, opened it and began jabbing and stabbing at all three of them to protect himself. After he had slashed at the three of them for awhile, they backed away and he was able to get up and run to his girlfriend. When onlookers told him to leave, he and his girlfriend got into their car and drove away. Appellant testified that he did not realize he had killed anyone until the next day and he turned himself in after hearing

that the police were looking for him. Throughout his testimony, appellant insisted that he was only trying to protect himself.

Our review of the record compels us to find that the issue of sudden passion was not raised by the testimony at trial. Although the evidence showed that appellant was afraid at the time of the incident, this Court has held repeatedly that fear, standing alone, does not raise sudden passion. *Smith v. State*, 721 S.W.2d 844 (Tex.Cr. App.1986); *Daniels v. State*, 645 S.W.2d 459 (Tex.Cr.App.1983). Furthermore, it is clear that throughout the trial the whole theory of the defense team was that appellant was acting in self-defense. Defense counsel began his voir dire examination of the jury by telling them that appellant was pleading not guilty to the charge of murder, "based on the law of self-defense." Then he proceeded to question the potential jurors on their views about the law on self-defense. In talking about the possibility of appellant being found guilty of any lesser included offenses defense counsel urged the jurors not to be confused between the lesser included offenses and the use of self-defense. Representative of his comments is the following:

"We are talking about these lesser included offenses, I hope that you don't— you feel that the defendant did use self-defense, hope that you don't compromise your verdict and convict him of aggravated assault or voluntary or involuntary manslaughter simply because there is a dead man."

This type of statement was repeated during final argument at the guilt-innocence portion of the trial when defense counsel argued the following:

"The only question is whether or not that boy is at blame at all. And I am not saying that any lesser included offense (sic) are appropriate. I don't think they are appropriate. I agree with the DA. This isn't a case—this is a case of murder or a case of self defense. It's not aggravated assault. All that other stuff might tend to confuse you. You can go

in there and figure it all out if you want to. That's not my argument to you here today. My argument to you here today is if this is not a case of self defense, what is."

Given the state of the record and the strategy used by the defense, we cannot say that the unobjected-to jury charge error caused egregious harm to appellant. *Smith v. State*, supra; *Lawrence v. State*, supra. As a result, our opinion on original submission is overruled to the extent that it reversed appellant's conviction for murder.

The State's motion for rehearing is granted and the judgment of the trial court is affirmed.

MILLER, J., dissents.

CLINTON, Judge, dissenting.

Just last year this Court delivered an opinion stating:

"We granted the State's petition for discretionary review in order to consider the court of appeals' holding that there was *fundamental error* in the jury charge. We *affirm* the court of appeals' ruling."

*Castillo-Fuentes v. State*, 707 S.W.2d 559 (Tex.Cr.App.1986).\* It is, therefore, sheer folly to claim, as the majority does at page 441 of its opinion, that "we have determined that such error is no longer fundamental error [and] our review of such unassigned error was error itself." Moreover, if the matter may constitute fundamental error, acting here on a direct appeal we certainly have power and authority to address it in the interest of justice. *Carter v. State*, 656 S.W.2d 468 (Tex.Cr.App.1983).

Turning to the merits, then, while the majority summarizes them it ultimately gives short shrift to facts of the matter, finding at page 443, that the issue of sudden passion was not raised by testimony. There is no analysis of evidence, particularly appellant's testimony recounted by the majority at pages 442–443 of its opinion in which among other emotions it characterizes appellant as "panicking" in the face of impending attack by three young hooli-

---

\* All emphasis is mine throughout unless otherwise noted.

gans—one of whom is armed with a hammer.

Cavalierly to say that *his* emotion was "fear, standing alone" is to minimize a patently obvious "degree of anger, rage, resentment or terror [this escalating assault upon his body by the trio would commonly produce] in *a person of ordinary temper.*" V.T.C.A. Penal Code, § 19.04(c). Compare *Castillo–Fuentes,* supra, at 560, and see prior cases where the Court found evidence sufficient to warrant an instruction on voluntary manslaughter, or to support a finding that the offense was committed: e.g., *Humphries v. State,* 615 S.W.2d 737 (Tex.Cr.App.1981) (stabbing in course of heated argument); *Braudrick v. State,* 572 S.W.2d 709 (Tex.Cr.App.1978) (stabbing in barroom brawl); *Lucky v. State,* 495 S.W.2d 919 (Tex.Cr.App.1973) (shooting shortly after insulting conduct led to heated argument); *Parks v. State,* 473 S.W.2d 32 (Tex.Cr.App.1971) (stabbing during argument over dollar debt). Significantly, appellant testified that he was unaware he had killed anyone until the next day.

The judge of trial court believed evidence raised an issue of sudden passion as he charged the jury on it, *Daniel v. Sate,* 668 S.W.2d 390, at 393 (Tex.Cr.App.1984); according to *Lawrence v. State,* 700 S.W.2d 208 (Tex.Cr.App.1985), it is sufficient, *viz:* testimony that accused was "very angry and upset" at earlier behavior of deceased "shows provocation and, when coupled with the decedent's alleged beating of appellant immediately preceding the shooting, is sufficient to raise the issue of sudden passion," *id.,* at 211. Here, there is provocation throughout, from initial dangerous attempt to "curb" the Firebird driven by his companion, unlawful pursuit to their apartment complex, deliberate hostile confrontation and ensuing gang assault.

The majority makes too much of statements in voir dire by and of content of argument of counsel for appellant. Essentially it reprises the notion first advanced in *Lawrence v. State,* supra, at 213, that "voluntary manslaughter is an incidental theory of the defense." But an issue of sudden passion raised by evidence "need not be a 'theory' claimed by one party or another—it exists independently in the evidentiary facts of the matter. *Daniel v. State,* 668 .S.W.2d 390, 393 (Tex.Cr.App. 1984)," and counsel should not be required to "run the greater risk of demanding that his client be found guilty of a lesser included offense in order to predicate a claim of deprivation of due process and due course of law through fundamental error committed by a trial court in instructing the jury as to elements it must find to convict him of the greater offense." *Ex parte Chandler,* 719 S.W.2d 602 (Tex.Cr.App.1986) (Clinton, J., dissenting at 608 and n. 10 and accompanying text).

Long ago the Court taught a lesson that the majority is unwilling to accept and follow, *viz:*

> "However, it is not necessary that the testimony of the accused be that which raises the issue of manslaughter. Indeed, he may assert that the killing was attributable to another cause than passion; but if the facts of the case in evidence fairly tend to indicate a homicide resulting from any such emotion of the mind as renders it incapable of cool reflection, it becomes the duty of the trial court to submit voluntary manslaughter, and leave to the jury the ascertainment of whether or not such killing was the result of such cause, and whether or not such cause was adequate. We have held that manslaughter should have been submitted, even though the accused claimed the homicide an accident, [citation omitted]; also when he claimed it committed in self defense, [citations omitted], also when he claimed an alibi, [citation omitted]."

*Steen v. State,* 88 Tex.Cr.R. 256, 225 S.W. 529 (1920) (Opinion on State's Motion for Rehearing, at 531).

The supreme irony in all of this is that the majority views "the strategy used by the defense," at 443, in light of more developments occurring long after the trial of this case. *Quaere:* Had the trial court given the jury a correct and proper charge on the State's burden of proving the absence of immediate influence of sudden

passion arising from adequate cause, *Braudrick v. State*, 572 S.W.2d 709 (Tex. Cr.App.1978), would the defense "strategy" be that which the majority critiques today?

This cause was correctly decided without dissenting opinion more than four years ago.

I dissent.

DUNCAN, J., joins in this opinion.

TEAGUE, Judge, dissenting.

I respectfully dissent to the majority opinion.

This is a non-capital direct appeal case that has been on this Court's docket since February 21, 1980. It was not submitted until January 12, 1983. On March 3, 1983, without any judge dissenting and with only one judge concurring in the result, the opinion I authored for the Court was handed down.

When appellant's cause was docketed, this Court had the policy, just like its counterparts on the federal side have, that it would always consider unassigned error if the error was deemed by a majority of this Court to be "fundamental error". As to just what might be considered fundamental error, this became a judgment call by the majority. However, as seen by the list of subjects that is set out in 4 *Texas Criminal Practice Guide* § 9.07[5][f], subject to a majority vote, the subject matter was without any limits.

The original opinion of this Court held that the trial judge's jury charge in this cause was fundamentally defective because the burden of proving the lack of sudden passion was not placed upon the prosecution. In so holding, the opinion relied almost entirely upon *Cobarrubio v. State*, 675 S.W.2d 749 (Tex.Cr.App.1983), which had just recently been approved by this Court on January 12, 1983. In short, when the opinion of *Jenkins,* supra, was handed down, *Cobarrubio,* supra, was just then "hot off the press". There were no dissents to what the Court stated and held in *Cobarrubio,* supra. One judge concurred in the result. On September 26, 1984, with only two judges dissenting, the State's motion for rehearing in *Cobarrubio,* supra, was denied without opinion or comment.

I am still firmly convinced that what I wrote for the Court on original submission was correct. I also believe that what I have stated in the dissenting opinions that I filed in *Goff v. State*, 720 S.W.2d 94 (Tex.Cr.App.1986); *Lawrence v. State*, 700 S.W.2d 208 (Tex.Cr.App.1985); *Castillo–Fuentes v. State*, 707 S.W.2d 559 (Tex.Cr. App.1986); and *Moore v. State*, 694 S.W.2d 528 (Tex.Cr.App.1985), is still good law, and some day my remarks will be vindicated.

It has been said that "Trial courts search for truth and appellate courts search for error." *2,000 Famous Legal Quotations* 131. To a certain extent this is true.

The members of this Court sit far removed from the field where the battle was fought, and oftentimes lead a monastery type existence. One weakness an appellate court has is that its members do not have the vantage point of what occurred in the trial court that a trial judge has. For example, in this instance, the trial judge, from his position in the pits, concluded as a matter of law that the evidence sufficiently raised the issue whether the killing by appellant was done under sudden passion and he so instructed the jury. Unfortunately, he failed to place in the charge the requirement that the burden was on the prosecution to prove that there was a lack of sudden passion on the part of appellant when he allegedly killed the deceased.

Today, however, a majority of this Court, sitting approximately 200 miles from the location where the trial took place, after almost three years, after leisurely leafing through the pages of the record of appeal, in an almost pastoral and antiseptic type sitting, concludes that the trial judge erred egregiously when he concluded that the issue of sudden passion was raised by the evidence adduced at trial. Today, a majority of this Court concludes that the trial judge should not have given the instruction on sudden passion in the first place and erred egregiously by so charging the jury.

There is no doubt whatsoever in my mind that a majority of this Court, which would include myself, would unquestionably over-rule a defendant's contention that a trial judge erred by not permitting his trial counsel to argue *for as long as he saw fit.* And yet, in this instance, a majority of this Court has the audacity to find fault with the way that appellant's counsel argued the case and also faults him for not arguing every conceivable aspect of the case on which the jury was instructed, *no matter how long it took.* Of course, contrary to trial counsel when he argued his case, time constraints, just like changing the rules after the game commences, usually do not trouble an aggressive and assertive majority of this Court.

It is obvious to me by what the majority opinion states, either expressly or implicitly, that those members of this Court who vote for the opinion have too long been away from the pits. After carefully reading the majority opinion several times, and the above opinions to which I dissented with opinions, it appears to me that the suggestion that I have heard some lawyers and trial judges make, that some appellate court judges should be forced to periodically come down from their place on Mount Appeal, and see the real world in action, probably has a great deal of merit.

In conclusion, I find that what Justice Jackson said many years ago is probably just as true today as the day when he uttered these words: "We are not final because we are infallible, but we are infallible only because we are final." *Brown v. Allen,* 344 U.S. 443, 540, 73 S.Ct. 397, 427, 97 L.Ed. 469 (1953). This is so true of those members of this Court who vote for the majority opinion.