# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-03-00330-CR

Michael Dillon Romine, Appellant

v.

The State of Texas, Appellee

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT
NO. 5020096, HONORABLE JON N. WISSER, JUDGE PRESIDING

M E M O R A N D U M   O P I N I O N

Michael Dillon Romine appeals from his sentence for first-degree felony murder pursuant to a non-negotiated guilty plea. *See* Tex. Pen. Code Ann. § 19.02(b), (c) (West 2003). After a hearing, the trial court assessed punishment at twenty-six years' confinement. In one issue, appellant contends that the trial court erred in failing to assess punishment for a second-degree felony because appellant proved that he acted under the immediate influence of sudden passion. *See id.* § 19.02(a), (d).[1]

---

[1] Although appellant presents a single issue, we must recount the events on the day of the murder in some detail. We have omitted specifics of the character witnesses' testimony. Generally, one counselor testified to observing violent and threatening behavior; another counselor and appellant's mother testified to the opposite effect.

## Background

In essence, this murder happened because appellant had been cheated one too many times in drug transactions. Deciding that he would not be cheated again, he purchased a gun and as he later stated, "If you're gonna pull it, use it, so that's what I did."

### *The Encounter*

John Anthony Hernandez testified that the deceased, Victor Garza, Jr., also known as "T.," was his cousin. On the day in question, he, Garza and a third man, Javier Martinez, also known as "J.V.," met at Garza's house. Martinez had arranged to buy some marihuana from appellant, and arranged a place to meet.[2] After smoking some marihuana, they got into Hernandez's brown two-tone Grand Marquis with Garza driving and left for the meeting place. Garza told Hernandez he wanted to "jack this guy." When they arrived, they saw appellant's green pick up truck, passed it, turned around, and pulled up behind the truck. Garza left the engine running. Martinez got out and conducted a transaction with appellant, the man in the green truck. Garza told Hernandez that appellant had a gun. Martinez then came back, threw some marihuana in the car, returned to talk to the man at the truck, jumped back into the car, slammed the door, and told Garza to "peel out." Hernandez did not see either Martinez or Garza with a gun and was sure there was not one in the car.

They were about to drive away when appellant came toward the front of the car, pointing a gun. Hernandez had seen him around and knew him by name. Appellant stopped right

---

[2] The designated location was approximately at 12822 Kimbro Road, in eastern Travis County, east of Manor.

2

in front of Garza. With a determined look on his face, appellant pointed the gun at Garza and said, "What now?" Garza was about to "peel out," but just looked at the gun and froze. Finally he took off, and then the shots began. Hernandez put his head down between his legs to avoid being hit. He heard Garza say, "I got shot." Hernandez looked up, saw the back windshield had been shattered, Garza was slumping from left to right, and they were headed for a pole. He warned Garza, but Garza was unconscious and the car smashed into the pole.

As Hernandez looked in the car mirror, he saw blood all over his face and in his eye. He managed to open a door and squeeze out of the car. Martinez was already out of the car and told Hernandez to go get help. Hernandez left, then returned to the car to find Martinez gone and Garza appearing lifeless.

On that day, Stephen Hildebrand was working as a shop hand at an air conditioning business. He testified that he and another employee, Daniel Hernandez, were loading a truck and noticed a small green pickup truck pull over to the side of the road, stopping about seventy-five yards from the shop. A man got out and opened the hood and passenger door. He was about eighteen to twenty five years old, white, and never turned to face them. The man did not appear to be working on the truck, which sat there for fifteen to twenty minutes. Hildebrand heard two pops, then a third pop, and saw a brown two-tone car speed away. Then Hildebrand saw a person step out from behind the cab of the truck and shoot towards the car. Because the young man who fired the shot was wearing a light-colored T-shirt and a pair of jeans, as did the man he originally saw at the pickup, he assumed the shooter was the same man, later identified as appellant. The gun was two-toned, perhaps chrome and black, and was a .9 millimeter or a .45 automatic. Hildebrand watched as the

3

young man casually went around to the hood, closed it, got in the truck, made a big loop around and then drove north towards highway 290, the same direction that the brown car had gone.

A few minutes later, Hildebrand saw the unusual sight of a man walking on the road. Hildebrand walked out to the end of the building and then saw the brown two-tone vehicle wrecked on the other side of the street, with a bullet hole in the back window. He went to the brown car and found the driver slumped over the seat, gasping for breath. The Hispanic driver appeared to have a bullet hole in his neck, at the point at which the neck and shoulder join. A dazed young Hispanic male, blood on his forehead, was walking around the car. Hildebrand yelled for someone to call 911.

Daniel Hernandez (for clarity, "Daniel"), who was helping to load the truck, also noticed the small green pickup truck. He noticed the young man, wearing what Daniel described as a grayish shirt and blue denim shorts. He noticed the brown two-tone car drive by the pickup, then turn around and head back toward it. Daniel heard four shots. He did not hear any shouting. As the car drove past the truck Daniel saw the young man start shooting at the car. The young man seemed calm, cool, unhurried, and acted as if he knew what he was doing. Because Daniel and Hildebrand were also worried about being shot, they ducked.

Daniel and Hildebrand ran around the side of the building and saw the brown car in the ditch; the green pickup was nowhere in sight. The driver, who was gasping for air, was shot both in the neck and somewhere in the rib cage. He noticed one Hispanic male walking down the street backwards, with his hand in his shirt. The third person seemed stunned, had a cut on his head, and was moving around opening the car doors.

4

*Aftermath*

Deputy Belinda Barho testified that she heard the "be on the lookout" warning for a small green pickup carrying one white male and one Hispanic female in their late teens. Barho saw a pickup matching the description and followed it for a while, but she lost sight of it after the driver took several evasive maneuvers.

Later, Keith Mutscher, a crime scene specialist, photographed the green pickup where it had been abandoned. A sheriff's deputy informed him that they needed to look for a handgun that might have been deposited at that scene. They located the gun wrapped in a pillowcase in a garbage barrel. The gun was a Ruger P-93 9-millimeter, with an eighteen round magazine containing fourteen rounds of ammunition.

Detective Chris Orton of the Travis County Sheriff's Office was the case investigator assigned to the case. He testified that he received a tip which lead to appellant's arrest in Brownsville. Appellant confessed on videotape to the Brownsville police. At the Travis County Jail, appellant agreed to talk to Orton as well.

At trial, the State introduced the medical examiner's report, which detailed Garza's autopsy, into evidence. The report explained the paths the bullets took through Garza's body and the damage they inflicted. Based on the presence of gunshot embedded in Garza's skin, the medical examiner concluded that two shots were fired into Garza's side at a close range, from his left.

Appellant did not testify. However, his two videotaped police interviews were admitted. Appellant said he bought the gun at a gun show shortly before the offense because it made him feel safe. On the day of the offense, Martinez called appellant, wanting to buy some marihuana.

5

Martinez chose the place where they were to meet. When appellant showed him the marihuana, Martinez looked at it and ran off with it. Appellant chased Martinez to the car, pulled the weapon, and told Martinez to give appellant the money or the marihuana, because appellant could not take any more losses. Appellant saw Martinez move and thought he was being attacked. Appellant moved out of the way, and his gun went off. Martinez then jumped in the car, ducked down, and the car took off. Appellant might have fired some more shots at the car but was not sure. He thought he fired one more time, hitting the back window. He "panicked" when he saw a hole in the back windshield right in line with the driver's head and drove away.

Appellant said he knew the driver of the car as Victor Garza, but did not know him well. Garza had been driving at a previous marihuana sale in which appellant had been cheated. Appellant denied having any anger, grudge, or desire for revenge against Garza. When appellant saw Garza at a party sometime afterward, he told him that there were no hard feelings. But appellant asserted that he could not afford to keep getting "stuff" stolen from him, and that he had been "jacked" about ten to fifteen times in the past three years. He said, "If you're gonna pull it [the gun], use it, so that's what I did."

Appellant told a similar story to Orton. He stated that he had left the scene, picked up his girlfriend, then returned. He recalled that seeing all of the lights at the scene and an ambulance which was driving away slowly "freaked him out" because he knew somebody had died. He described his attempts to avoid arrest, including his trip to Brownsville.

6

## Discussion

*Jurisdiction*

As a preliminary matter, the State challenges this Court's jurisdiction. It contends that appellant's motion for new trial, regardless of its title, was not actually a motion for new trial because it did not request that his finding of guilt be set aside and the trial court could not grant a new trial on punishment only. *See* Tex. Code Crim. Proc. Ann. art. 44.29 (West Supp. 2005); *Hight v. State*, 907 S.W.2d 845, 847 (Tex. Crim. App. 1995) (stating that under art. 44.29(b) only appellate courts may grant new trial solely on issue of punishment). Without the extension afforded by a motion for new trial, appellant's notice of appeal would be untimely and this Court would lack jurisdiction. Tex. R. App. P. 26.2(a)(2).

But appellant's motion for new trial stated that it was filed "pursuant to" rule 21, which only permits a new hearing after the trial court has set aside a finding or verdict of guilt. *See* Tex. R. App. P. 21.1, 21.9. Additionally, a trial court "may properly entertain a motion for new trial, grant it, rehear the defendant's plea, and re-sentence him, and it does not thereby violate the prohibition against a grant by a trial court of a new trial as to punishment only." *State v. Aguilera*, 165 S.W.3d 695, 698 n.6 (Tex. Crim. App. 2005). Moreover, because the trial court sentenced appellant on February 7, 2003, and appellant filed his motion on March 6, 2003—within thirty days of his sentencing—the trial court retained plenary power to modify its sentence. *See* Tex. R. App. P. 21.4(a); *Aguilera*, 165 S.W.3d at 697-98. We find that appellant's motion for new trial extended his appellate deadline and his April 25, 2003 notice of appeal was timely. *See* Tex. R. App. P. 26.2(a)(2).

7

*The "Sudden Passion" Punishment Issue*

Texas Penal Code § 19.02 provides:

(a) In this section:

   (1) "Adequate cause" means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.

   (2) "Sudden passion" means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation.

(b) A person commits an offense if he: [forms of murder].

(c) Except as provided by Subsection (d), an offense under this section is a felony of the first degree.

(d) At the punishment stage of a trial, the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree.

Tex. Pen. Code Ann. § 19.02 (West 2003).

We review the fact-finder's negative finding on sudden passion using a factual sufficiency standard of review. *Rainey v. State*, 949 S.W.2d 537, 542 (Tex. App.—Austin 1997, pet. ref'd). We consider all of the evidence in a neutral light and determine whether the State's evidence taken alone is too weak to support the finding and whether the proof of guilt, although adequate if taken alone, is against the great weight and preponderance of the evidence. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). The use of this standard to review "sudden passion"

8

developed by analogy to the one used in a factual sufficiency review of the rejection of an affirmative defense. *See Hernandez v. State*, 127 S.W.3d 206, 211-12 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

### Adequate Cause

Sudden passion is essentially a culpable mental state. Mental states are generally inferred from acts and words. *See Moore v. State*, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998). Mental culpability generally must be inferred from the circumstances under which a prohibited act or omission occurs. *Id*.; *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991).

"Sudden passion" must arise from adequate cause. Tex. Pen. Code Ann. § 19.02(a)(1). Causes that would not render the ordinary person's mind incapable of cool reflection do not constitute adequate cause. *Hernandez*, 127 S.W.3d at 213-14. Ordinary anger or causes of a defendant's own making are not legally adequate causes. *Id*. at 211. Fear, standing alone, does not raise the issue of sudden passion. *Jenkins v. State*, 740 S.W.2d 435, 443 (Tex. Crim. App. 1987); *Smith v. State*, 721 S.W.2d 844, 854 (Tex. Crim. App. 1986). The fear must rise to a level of terror which makes a person of ordinary temper incapable of cool reflection. *Daniels v. State*, 645 S.W.2d 459, 460 (Tex. Crim. App. 1983). Even an actor who fears for his life may nevertheless cooly and deliberately kill his assailant. *See Fry v. State*, 915 S.W.2d 554, 559 (Tex. App.—Houston [14th Dist.] 1996, no pet.). Sudden passion must arise at the time of the offense and cannot result solely from former provocation. *Hernandez*, 127 S.W.3d at 213. The victim's past conduct, however, can help place in context the victim's provocation at the time of the offense. *Id*. at 213 n.5. Provocation

by people other than the victim or one acting with the victim does not meet the definition of sudden passion. *Id*. at 213.

### *Sufficiency of Evidence*

Appellant told both the Brownsville and Austin police that he bought the gun because he had been "ripped off" ten to fifteen times in the past three years and could not afford any more losses in his drug deals. The trier of fact could have drawn a reasonable inference that appellant was motivated by a desire to protect his economic interests, rather than rage or terror.

Appellant said that he was not "mad" at Garza, even though Garza had been the driver at a previously soured drug deal. Appellant never claimed to be terrified, angry, resentful, or afraid. Appellant's only references to any kind of agitation or panic occurred when he described seeing that the bullet hole in the rear window of the car was in line with the driver's head and when, after picking up his girlfriend, he returned to the scene and saw an ambulance driving slowly away, without its flashing lights activated. Appellant said that purchasing the gun made him "feel safe" but a general fear does not rise to the level of sudden passion. *See Jenkins*, 740 S.W.2d at 443. In fact, appellant's actions were described by Daniel Hernandez as "calm and cool." *See Fry*, 915 S.W.2d at 559 (stating that one can fear for life but be cool while killing); *see also Moore*, 969 S.W.2d at 10 (inferring mental state from acts and words).

Further, the trial court was not obligated to accept as true appellant's version of the facts. *Mixon v. State*, 367 S.W.2d 679, 680 (Tex. Crim. App. 1963). The number of times appellant claimed he shot conflicted with the physical evidence at the scene and the eyewitness accounts of

the number of shots heard. Appellant at one point attempted to claim his first shot was accidental. However, he also told the police that if one pulls a gun, one uses it.

Appellant did not meet his burden of producing evidence to show that he killed Garza while acting out of passion caused by Garza's provocation, or another acting with Garza, producing such a degree of anger, rage, resentment, or terror that the mind of a person of ordinary temper would have been rendered incapable of cool reflection. *See* Tex. Pen. Code Ann. § 19.02(d). Conversely, appellant's actions seemed more consistent with a plan to prevent further losses during drug deals. We overrule appellant's only issue.

## Conclusion

Viewing all of the evidence in a neutral light, the trial court's decision not to find in appellant's favor on the sudden passion issue was not so against the great weight and preponderance of the evidence as to be clearly wrong or manifestly unjust. Having overruled appellant's only issue, we affirm the trial court's judgment.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed: April 6, 2006

Do Not Publish

11