David MADRIGAL

v.

The STATE of Texas.

No. 3–92–181–CR.

Court of Appeals of Texas, Austin.

March 31, 1993.

Linda Icenhauer–Ramirez, Austin, for appellant.

Ronald Earle, Dist. Atty. by Philip A. Nelson, Jr., Asst. Dist. Atty., Austin, for appellee.

Before CARROLL, C.J., and ABOUSSIE and JONES, JJ.

PER CURIAM.

A jury found appellant guilty of capital murder. Tex.Penal Code Ann. § 19.03 (West 1989 & Supp.1993). Because the jury did not find that there was a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society, the court assessed punishment at imprisonment for life. Act of May 27, 1991, 72nd Leg., R.S., ch. 652, § 9, 1991 Tex.Gen.Laws 2394, 2395 (Tex.Code Crim.Proc.Ann. art. 37.071, since amended).

After midnight on March 5, 1991, appellant and his brothers, Juan and Marcello Gonzales, abducted Robert Bettelyoun at gunpoint as he arrived home from work and drove him to a roadside park on Highway 71 east of Austin. The three brothers believed that Bettelyoun had broken into Marcello's car two days earlier and stolen $1200 worth of stereo equipment. At the park, appellant pointed his .380 caliber pistol at Bettelyoun and demanded the return of his brother's property.

The brothers' interrogation of Bettelyoun was interrupted by the arrival of Department of Public Safety trooper Carlos Warren, who drove into the roadside park in the course of his routine patrol. The officer stopped beside appellant's car on the passenger side, using his spotlight to illuminate the interior of the vehicle. Appellant was sitting in the driver's seat, Marcello was in the front passenger seat, and Juan and Bettelyoun were in the back seat. Appellant told the others, in Bettelyoun's words, "to just be cool, that he would get us out of this, not to worry about it." Marcello described the subsequent events:

Q  What happened then?
A  Well, he just started asking us what are you-all doing here, and then I think it was David told him that we were just taking a break from traveling.
. . . .
Q  Did the trooper get out of the car?
A  Yes.
Q  What happened when he got out of the car?
A  He came to my side window and he flashed his flashlight in.
. . . .
Q  What happened next?
A  He just—it was like he just thought for a couple of seconds and then he

said, okay, why don't you two guys in the front seat get out real slowly.

Q   Prior to that time, do you remember David saying be calm, I will get us out of this?

A   Yes, I remember him saying that.

. . . .

Q   How long do you think it was from the time that you first realized there was a spotlight on the car until the time that the officer said get out of the car slowly?

A   It might have been about two minutes maybe, two or three minutes.

. . . .

Q   What happens then?

A   I started to get out real slowly because I was real scared.

Q   Did you still have your gun?

A   No. ... I just threw it underneath the seat.

. . . .

Q   What does the trooper do after he says get out of the car slowly?

A   He starts walking around the front of the car to the driver's headlight over here.

. . . .

Q   What happens when he gets there?

A   It is like—it was like he forgot something because I was looking at him the whole time, and then he made like an about face, 180 degree turn, turned around, turning inside like towards the car.

. . . .

Q   Okay.  What happened?

A   And he turned around and he started walking back towards my headlight.

Q   What happened then?

A   When he turned around, he put his hand on his gun and he started bringing it out of his holster, and then when he got to about my headlight, that is when the shooting started.

. . . .

Q   Did he have his back to David?

A   Yes.

Q   What did David do?

A   It seemed like when he got to like the front of my headlight it was like I felt David like shake real hard and he just jumped out of the car.

. . . .

Q   What happens then?

A   He opened fire.

Q   As the officer's back is to him; correct?

A   Right.

Q   What do you do when you hear the shooting start?

A   Well, I was getting out very, very slowly, and when I heard it start, I just—I slammed the door and I jumped back and put my head down.  As I was putting my head down, I saw the policeman start falling down.

Q   How many times did David shoot?

A   I don't know.  I just heard a whole bunch of bullets.  I don't know.  It was like a whole bunch of shots. . . .

. . . .

Q   Who was shooting those shots?

A   My brother David.

Q   What happens next?

A   David got in the car and started it up and then I heard like three shots fired back, two or three shots fired back.

Q   Did any of them hit the car?

A   Yes.

Q   How many?

A   I know one hit the front tire for sure because you heard it blow out the tire, and then I heard the other shots just hit like metal.  I don't know where, though, because I had my head down at the time.

Q   Does David say anything when he gets back in the car?

A   All he said was he shot the tire and he turned on the car, and then John [Juan] started yelling at him what did you do that for, what did you do that for.

Q   What did he say?

A   David said I had to do it because I thought he was going to get us.[1]

---

**1.**  During cross-examination, Marcello amended his testimony to indicate that appellant's words were "I had to do it because he was going to do us."

Appellant shot Warren three times in the back. The bullets punctured both lungs and severed the spinal cord. The officer died within minutes.

Appellant fled Austin after the shooting, apparently intending to drive to his father's house in Laredo. In San Antonio, appellant attempted to shoot a police officer who stopped him for a traffic violation. The officer returned fire, wounding appellant. Two days later, in the hospital, appellant gave a tape-recorded statement in which he confessed to shooting Warren. Asked why he did it, appellant stated that he was "scared" and "just panicked."

In points of error two and three, appellant contends the district court erred by refusing his request for instructions on the lesser included offenses of involuntary manslaughter and criminally negligent homicide.[2] The State agrees that both lesser offenses were included within the proof necessary to establish appellant's commission of capital murder. The contested issue is whether there was some evidence from which the jury could rationally find that appellant was guilty only of one of the lesser offenses. *Rousseau v. State*, No. 70,910, 1993 WL 44431 (Tex.Crim.App. Feb. 24, 1993); *Royster v. State*, 622 S.W.2d 442, 446 (Tex.Crim.App.1981) (opinion on rehearing). The only evidence cited by appellant in support of the requested charges is a remark he made to a Bexar County detention officer following his arrest in San Antonio. This officer testified that appellant told him that "he didn't mean to kill anybody." Appellant argues that this statement negates the element of intent and raises an issue as to whether he recklessly or negligently killed the officer.

Appellant relies on the opinions in *Schoelman v. State*, 644 S.W.2d 727 (Tex.Crim.App.1983), and *Giles v. State*, 617 S.W.2d 690 (Tex.Crim.App.1981), in support of both points of error. Both of these opinions have been criticized as having incorrectly stated that the act of pointing a loaded gun at another, in itself, constitutes criminal negligence. *Thomas v. State*, 699 S.W.2d 845, 849–50 (Tex.Crim.App.1985). The attendant circumstances from which the defendant's mental state can be inferred must be collectively examined in light of the statutory definitions of the culpable mental states. *Id.* That the State, in proving the offense of capital murder, also proved the lesser offenses of criminally negligent homicide and involuntary manslaughter does not, standing alone, entitle appellant to a charge on the lesser included offenses. *Tompkins v. State*, 774 S.W.2d 195, 210 (Tex.Crim.App. 1987).

Testimony by the accused denying the requisite culpable mental state for the charged offense has been held in some cases to warrant an instruction on a lesser included offense. One example of this is *Thompson v. State*, 521 S.W.2d 621 (Tex.Crim.App.1974). *Thompson* was a prosecution for assault with intent to murder a police officer. The officer testified that the defendant, during a chase from the scene of another offense, pointed a pistol in his direction and fired. The defendant testified that he did not aim or shoot the pistol toward the officer, and that he did not intend to kill the officer. In holding that the trial court erred by refusing a requested instruction on the lesser included offense of aggravated assault, the court wrote:

> The jury in the present case could have *reasonably* rejected the appellant's testimony that he did not fire at the officer; it could have *reasonably* believed the officer's testimony that the appellant did fire the pistol at him at close range; it

---

**2.** A person commits involuntary manslaughter if he recklessly causes the death of an individual. Tex.Penal Code Ann. § 19.05(a)(1) (West 1989). A person acts recklessly with respect to the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. Tex.Penal Code Ann. § 6.03(c) (West 1974).

A person commits criminally negligent homicide if he causes the death of an individual by criminal negligence. Tex.Penal Code Ann. § 19.07 (West 1989). A person acts with criminal negligence with respect to the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the result will occur. Tex.Penal Code Ann. § 6.03(d) (West 1974).

could have *reasonably* believed the appellant's testimony that he did not intend to kill the officer. The appellant has the right to have the jury and not the court decide these issues from the evidence under proper instruction.

*Thompson,* 521 S.W.2d at 624.

*Thompson* was followed in *Lugo v. State,* 667 S.W.2d 144 (Tex.Crim.App.1984), a prosecution for murder. The defendant shot and killed his wife during an argument. He testified that he did not intend to kill his wife, did not cock the gun or load it, and believed the weapon was empty. The court held that the defendant's request for a charge on involuntary manslaughter was erroneously overruled.

> [T]he jury as the trier of fact could have reasonably rejected the appellant's testimony that he was unaware that the rifle was loaded; it could have reasonably believed the witness's testimony that the appellant cocked and pointed the rifle at the victim and thus could have inferred from such action that the appellant knew the rifle was loaded; and it also could have reasonably believed appellant's testimony that he did not intend to kill his wife. Accordingly, the jury could have reasonably concluded that appellant's action in pointing a loaded rifle at his wife in an attempt to persuade her to relinquish the keys to a car constituted a conscious disregard of "a substantial and unjustifiable risk."

*Lugo,* 667 S.W.2d at 149.

The opinions in *Thompson* and *Lugo* must be read together with the opinion in *Godsey v. State,* 719 S.W.2d 578 (Tex.Crim. App.1986). In *Godsey,* several police officers responded to a disturbance call at the defendant's apartment. When the defendant opened the door to the apartment, he had a pistol in his waistband. Ignoring instructions not to do so, the defendant pulled the pistol from his waistband and took careful aim at an officer standing in front of him, whereupon he was shot by another officer. At his trial for attempted capital murder, the defendant testified that he did not intend to kill anyone, but his requested charges on the lesser offenses of

aggravated assault and reckless conduct were denied. The Court of Criminal Appeals found no error.

> The statement [that he did not intend to kill the officer] cannot be plucked out of the record and examined in a vacuum. The instant case is not like ... *Thompson,* supra, in which part of a defendant's testimony could be reasonably believed by a jury in the context of the facts, so as to support a charge on the lesser included offense. See *Lugo v. State.*
>
> ....
>
> Appellant's actions progressed step by step toward the firing of the gun which was prevented only by the officers' "beating him to the trigger." Such actions manifest only the intent to kill the officer and do not evidence a mere threat with the gun.... The deliberateness of appellant's actions belies any attempt to simply threaten. The evidence does not support any inference that appellant is guilty only of aggravated assault or reckless conduct.

*Godsey,* 719 S.W.2d at 584–85 (citation omitted); *see also Mendieta v. State,* 706 S.W.2d 651 (Tex.Crim.App.1986) (victim stabbed to death; defendant testified he did not intend to kill; held, evidence did not raise issue of criminally negligent homicide).

Appellant's statement that he did not intend to kill anyone raises an issue as to appellant's culpable mental state only if it is taken alone and out of context. The statement loses its force within the context of the other facts concerning the offense, all of which are uncontradicted. On the night in question, appellant armed himself and, with his brothers, kidnapped Bettelyoun. Appellant drove Bettelyoun to the roadside park and, either implicitly or explicitly, threatened to kill him. When the highway patrolman drove up, appellant assured his companions that "he would get [them] out of this." When Warren turned his back, appellant jumped from his car, pointed his pistol at the officer, and fired repeatedly. As he drove away after shooting the officer, appellant told his compan-

ions that he "had to do it." As in *Godsey*, the deliberateness of appellant's actions belies any claim that he did not intend to kill the officer. Moreover, in his recorded statement to the police, appellant did not suggest that he had no intention of killing the officer, but instead indicated that he shot the officer because he was afraid and panicked. The evidence as a whole does not support a rational inference that appellant, when he shot Warren in the back, was merely unaware of or consciously disregarding the risk of death that his conduct created. The district court did not err by refusing to instruct the jury on the lesser included offenses. Points of error two and three are overruled.

In his first point of error, appellant contends the district court erred by excusing venire member Sharon Strasser Rodriguez after the defense waived its ground for challenge. The relevant statute is article 35.16 of the Code of Criminal Procedure, which reads in pertinent part:

(a) A challenge for cause is an objection made to a particular juror, alleging some fact which renders him incapable or unfit to serve on the jury. A challenge for cause may be made by either the state or the defense for any one of the following reasons:

. . . .

10. That from hearsay, or otherwise, there is established in the mind of the juror such a conclusion as to the guilt or innocence of the defendant as would influence him in his action in finding a verdict. To ascertain whether this cause of challenge exists, the juror shall first be asked whether, in his opinion, the conclusion so established will influence his verdict. If he answers in the affirmative, he shall be discharged without further interrogation by either party or the court. . . .

. . . .

No juror shall be impaneled when it appears that he is subject to the second, third or fourth grounds of challenge for cause set forth above, although both parties may consent. All other grounds for challenge may be waived by the party or

parties in whose favor such grounds of challenge exist.

Tex.Code Crim.Proc.Ann. art. 35.16(a) (West 1989).

Rodriguez was disqualified from jury service under article 35.16(a)(10). Rodriguez stated, shortly after her voir dire began, that she would find it difficult to be an objective juror given what she had heard about the case. The court then questioned her as follows:

Have you established in your mind a conclusion as to the guilt or innocence of the defendant, David Madrigal?

MS. RODRIGUEZ: Yes.

THE COURT: In your opinion, will the conclusion so established as to Mr. Madrigal's guilt or innocence influence your verdict if you're selected on the jury?

MS. RODRIGUEZ: I would like to say no, but I can't. It probably would. I would have to say yes.

The court gave Rodriguez a few minutes to think and then repeated the questions. She again answered both questions affirmatively. The court discharged Rodriguez even though defense counsel "waive[d] any objection that we might have" to the venire member under article 35.16(a)(10).

■ Appellant argues that despite the seemingly mandatory language of article 35.16(a)(10), he had the right under the statute to waive his objection to Rodriguez serving on the jury. Because he did waive his objection, appellant concludes that the court erred by excusing Rodriguez from jury service. This contention was not preserved for review. When a juror who is subject to challenge for cause but is not absolutely disqualified is excused by the court sua sponte, in order to preserve error and establish harm the defendant must, among other things, exhaust all of his peremptory challenges. *Green v. State*, 764 S.W.2d 242, 247 (Tex.Crim.App.1989). In this cause, appellant used only seven of his fifteen peremptory challenges. Even if appellant's waiver of his right to challenge Rodriguez is assumed to have qualified her for jury service, reversible error still is not shown because the State did not exhaust

its peremptory challenges. *Id.* at 246. Point of error one is overruled.[3]

The judgment of conviction is affirmed.

---

3. Were we to reach the merits of appellant's contention, we would hold it to be without merit. Article 35.16(a) states that a challenge for cause may be made by either the State or the defense for any of the reasons listed therein. Both parties have an interest in empaneling jurors who do not have a preconceived opinion of guilt or innocence that will influence their verdict. While appellant chose to waive his ground for challenge under subsection (a)(10), the State did not. In the absence of a waiver by both parties, the district court was required by the express terms of article 35.16(a)(10) to excuse the prospective juror.